UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

| | |
|---|---|
| SECURITY LIMITS INC., | : |
| | : |
| Plaintiff, | :   Case No. 21-CV-10124 |
| | : |
| -against- | : |
| | : |
| AVANGRID NETWORKS, INC., AVANGRID, | :   **COMPLAINT AND** |
| INC., IBERDROLA S.A., PROSEGUR GESTIÓN de | :   **JURY DEMAND** |
| ACTIVOS, S.L., UNLIMITED TECHNOLOGY, | : |
| INC., CIPHER SECURITY, LLC, PROSEGUR | : |
| SECURITY MONITORING, INC. f/k/a VIEWPOINT | : |
| CRM, INC., BLACK & VEATCH CORPORATION, | : |
| DAVID LATHROP, JOHN ALLEN, TOM | : |
| FITZGERALD, ENRIQUE VICTOREO, ANTONIO | : |
| ASENJO MARTIN, ED BOUCAS, ANDRE VIERA | : |
| ROLIM, BILL REILLY, and JOHN DOES 1 TO 100, | : |
| | : |
| Defendants. | : |

-------------------------------------------------------------------X

Plaintiff Security Limits, Inc., ("SLI") as and for its complaint, respectfully alleges, on knowledge with respect to itself and its own conduct, and on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.    This action arises out of a brazen racketeering scheme, replete with bid-rigging, accounting manipulation, warehouses built solely to house mountains of unused equipment procured under bogus pretenses, and the misappropriation and illicit transfer of proprietary business secrets. The scheme (the "Bid-Rigging Scheme") was operated through Defendant Avangrid Networks, Inc. ("Networks"), a company operating regulated energy utilities in New York and New England, and was conceived of by its parent, Avangrid, Inc. ("Avangrid"), along with Defendant Iberdrola S.A., the majority shareholder of Avangrid ("Iberdrola," and collectively with Networks and Avangrid, the "Utilities Defendants").

2.      Aiding in the Bid-Rigging Scheme were Defendants Prosegur Gestión de Activos, S.L. ("Prosegur") and two of its subsidiaries, Cipher Security, LLC ("Cipher) and Prosegur Security Monitoring, Inc. f/k/a Viewpoint CRM, Inc. ("PSM"); Defendant Unlimited Technology, Inc. ("UTI"); and Defendant Black & Veatch Corporation ("B&V," and collectively with Prosegur, Cipher, PSM and UTI, the "Vendor Defendants").  The Bid-Rigging Scheme took place between in or around 2018 to in or around 2020 (the "Relevant Period").

3.      Gross corporate misconduct is hardly unfamiliar to Defendants Iberdrola and Prosegur.  Former Iberdrola executives Antonio Asenjo Martin and Enrique Victorero, current Iberdrola Global Procurement Director for Networks Ignacio Sánchez Galán, and current Prosegur CEO Javier Tabernero have all been indicted or are under investigation by the High Courts in Spain for corporate espionage and procurement fraud.  As a result, New Mexico authorities have delayed authorization of Avangrid's proposed merger with PNM Resources, Inc. pending investigation of the Spanish indictments.

4.      As alleged in greater detail below, in combination with its confederates, the Utilities Defendants conducted the Bid-Rigging Scheme in order to steer valuable contracts to certain of SLI's competitors – ones willing to participate in a pay-to-play scheme.  In certain cases, the Utilities Defendants and/or Prosegur forced SLI to partner with favored vendors such as Cipher, PSM and B&V as a condition of bidding for contracts that SLI should have otherwise been able to pursue on its exclusive behalf.

5.      In other instances, the Utilities Defendants and/or Prosegur entities shared or caused to be shared the misappropriated trade secrets and bidding information of Plaintiff SLI with its competitors, effectively foreordaining the award of valuable contracts to those vendors and resulting in the wholesale subversion of Avangrid's bid process.  On numerous occasions, the

2

Utilities Defendants reissued earlier RFPs – for which SLI had already submitted best and final offers –to facilitate favored vendors, which would submit new bids styled to incorporate misappropriated SLI business secrets.

6. Under the Bid-Rigging Scheme, the Utilities Defendants eschewed competitive bidding, engaged in customer and market allocation, and steered contracts to vendors willing to provide equipment and services that were neither competitively priced nor situationally appropriate (and in some cases, unnecessary altogether). The Utilities Defendants awarded these inappropriate contracts in order, *inter alia,* to aid it in meeting critical quarterly capital expenditure targets in order to claim consistent depreciation benefits, and for personal gain such as securing retirement benefits with preferred vendors participating in the scheme.

7. The Bid-Rigging Scheme likewise benefited the Utilities Defendants' favored vendors, by giving them an unfair and improper advantage in the bid process, and by enriching their EBIDTA with excessive payments for unnecessary equipment and services.

8. The Utilities Defendants likewise conducted the Bid-Rigging Scheme as a means of retaliation against SLI, because, *inter alia,* SLI principal Paulo Silva would not permit SLI to participate in the corruption of the bidding process and had, in a whistleblower capacity, called attention to corporate waste and major lapses in critical infrastructure's cyber security. Moreover, the Utilities Defendants defamed SLI and Mr. Silva, by maligning them and otherwise making false claims about the quality of their work, injuring SLI financially and reputationally.

9. The Bid-Rigging Scheme, and its inherent waste, deprived SLI of valuable contracts it would have otherwise been awarded in an unrigged bidding process, wasted millions of rate-payers' dollars, and wrongly enriched the Bid-Rigging Scheme's participants.

10.    Defendants' conduct caused SLI significant financial and reputational harm, for which it seeks redress in this action.  Based upon the foregoing described scheme and conspiracy, SLI asserts claims against the Defendants herein pursuant to (i) the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C §§ 1962(c), (d) and 1964(c), (ii) Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), and Section 4 of the Clayton Act, 15 U.S.C. § 15, and (iii) the common law of the State of New York.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1337, since this action arises, *inter alia*, under Sections 1962(c) and (d) and 1964(c) of RICO, Section 2(c) of the Robinson-Patman Act, and Section 4 of the Clayton Act.  Supplemental jurisdiction is founded under 28 U.S.C. § 1367.

12.     Venue in this district is proper pursuant to 18 U.S.C. § 1965(a) and 15 U.S.C. §§ 15(a) and 22 because, *inter alia,* many of the Defendants reside, can be found, have an agent, or transact their affairs or business in this District.

13.    This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965 because, *inter alia,* each of the Defendants either resides, maintains offices, or conducts substantial business in New York, and/or conspired to and engaged in substantial conduct in connection with the Bid-Rigging Scheme in New York.

## PARTIES

14.    Plaintiff Security Limits Inc. is a New York corporation having a principal place of business at 50 Alberigi Drive, Jessup, Pennsylvania.

15.    Defendant Avangrid Networks, Inc. is a New York corporation  having a principal place of business at 89 East Ave, Rochester, New York.

4

16.     Defendant Avangrid, Inc. is a New York corporation having a principal place of business at 80 Marsh Hill Road, Orange, Connecticut.

17.     Defendant Iberdrola S.A. is a global energy company having a principal place of business at Plaza Euskadi, 5 Bilbao, 48009 Spain based in Bilbao, Spain.

18.     Defendant Prosegur Gestión de Activos, S.L. is a global security company having a principal place of business at 88 Calle Pajaritos, 24 Madrid, 28007 Spain.

19.     Defendant Unlimited Technology, Inc., a video monitoring company, is a Pennsylvania corporation having a principal place of business at 20 Senn Drive, Chester Springs, Pennsylvania.

20.     Defendant Cipher Security, LLC, a risk management and cybersecurity firm, is a Florida company having a principal place of business at 703 Waterford Way, Suite 490, Miami, Florida.  Cipher is a subsidiary of Prosegur.

21.     Defendant Prosegur Security Monitoring, Inc. f/k/a Viewpoint CRM, Inc., a video solutions and monitoring company, is a Massachusetts corporation having a principal place of business at 220 Howard Street, Lowell, Massachusetts, and a subsidiary of Prosegur.

22.     Defendant Black & Veatch Corporation, a civil engineering firm, is a Delaware corporation having a principal place of business at 6800 W. 115th Street, Suite 2292, Overland Park, Kansas.

23.     Defendant David Lathrop was Manager, Security Technical Services at Avangrid during the Relevant Period, and maintains a residence at 7220 Dryer Rd, Victor, New York.

24.     Defendant John Allen was a Senior Director of Corporate Security at Avangrid during the Relevant Period and remains in that position.

25.     Defendant Tom Fitzgerald was Director of Telecommunications & Engineering at Avangrid during the Relevant Period, and remains in that position.

26.     Defendant Enrique Victoreo was International Security Director at Iberdrola during the Relevant Period, and visited the United States frequently in the course of business during the Relevant Period.

27.     Defendant Antonio Asenjo Martin was Global Head of Security at Iberdrola during the Relevant Period, and frequently participated in meetings in the United States by video conferences and other means in the course of business during the Relevant Period.

28.     Defendant Ed Boucas was Chief Executive Officer of Cipher during the Relevant Period, and remains in that position.

29.     Defendant Andre Viera Rolim was Chief Financial Officer of Cipher during the Relevant Period, and frequently participated in meetings in the United States by video conferences and other means in the course of business during the Relevant Period.

30.      Defendant Bill Reilly was Executive Vice President, Sales at Prosegur Security Monitoring, Inc. f/k/a Viewpoint CRM, Inc. during the relevant period.

31.     Defendants John Does 1 to 100 are other Defendants who are liable to SLI based upon their participation in the Bid-Rigging Scheme alleged herein, but whose identities are currently unknown to SLI.

## **FACTS**

32.     Defendant Avangrid is an energy services and delivery company with $36 billion in assets and operations in 24 States.  Avangrid is a subsidiary of Defendant Iberdrola, a Spanish global energy company with assets worth more than €123 billion.  Defendant Networks, a subsidiary of Avangrid, owns and operates eight electric and natural gas utilities, serving 3.25

6

million customers in New York and New England.

33.     Investor-owned utilities such as those operated by Avangrid are regulated monopolies that are the only companies allowed to deliver electricity within the geographic areas they serve. The companies are charged with providing efficient, reliable, environmentally safe energy at the lowest cost.  In exchange, utilities are allowed to recover their costs, plus a profit. Such utilities are subject to both state and federal regulation, and subject to the oversight of the Public Utility Commission ("PUC") of the state in which the utility operates.

34.     PUC's generally determine a given utility's revenue requirements in what is called a "rate case" – a process designed to contemplate both what monies a utility must collect to cover its costs, and what additional monies it should collect to realize a reasonable profit.

35.     Under PUC regulations, investor-owned utilities are generally able to recover their spending on operational expenses ("OPEX"), but are not compensated above and beyond those outlays.  In contrast, PUCs allow for the recovery of investment in capital expenses ("CAPEX") plus a profit of 7-15%, depending on the State.  CAPEX contemplates the acquisition of a broad array of assets, including hardware such as transformers, fiberoptic cables, and data center equipment, as well as perpetual licenses for intellectual property.

36.     Utilities can also apply for rate increases on the basis of CAPEX investments in infrastructure upgrades, to the extent that they can demonstrate such improvements are necessary, prudent, and reasonable, given that they will be passed on to consumers via rate-case filing, and thus need to be recoverable over time.  Thus, while utilities are required to justify investment in infrastructure improvement, the regulatory structure provides an inherent incentive to reasonable spend on physical infrastructure, and to book expenditures as CAPEX, not OPEX.

11018316.3

37.     Unsurprisingly, the Utilities Defendants set quarterly CAPEX profit targets in recognition of the centrality of CAPEX to maximizing their shareholder value.

**The Tender Process**

38.     Consistent with the mission of PUCs to ensure the delivery of safe and reliable energy at the lowest cost, utilities are supposed to obtain competitive bids in the course of the procurement process.  To that end, when seeking goods and services, utilities are obliged to invite qualified suppliers to provide bids, which Avangrid purports to do through the issuance of requests for proposals ("RFPs"), or tenders.  Qualified bidders then submit detailed bids in response to the tenders, culminating in the bidder's best and final offer ("BAFO").  In a normal and transparent bidding process, the utility awards a given contract to the bidder judged most qualified on the basis of its BAFO, the quality of its submission submittal, and its overall experience and track record.

39.     Each of the Utilities Defendants had a role in the Avangrid procurement process. Networks issued the RFP tenders to prospective vendors.  The resulting bids and BAFOs were aggregated in Iberdrola's procurement system, which is housed in Spain.  The actual procurements were made by Avangrid itself.

40.     Tenders generally contemplate five service categories that, from an accounting perspective, are associated with the creation and maintenance of a network:

     i)      Design and Engineering Services, which contemplates the design and architecture of data centers, head-end systems, and networks; it also includes the development of purchasing requirements in the form of a Bill of Materials, and the purchasing all of the requisite hardware;

     ii)     Construction, which contemplates the creation and maintenance of the network's physical structures, and includes civil engineering, procurement, materials handling, code adherence and permitting;

8

iii)     Systems Integration, which contemplates the configuring and installation of the hardware necessary to effectuate the network's design in accordance with engineering specifications;

iv)     Program Management, which contemplates management and accountability over finances and accounting in accordance with rate-case regulations associated with the creation and maintenance of the network. Program Management involves the day-to-day management of scope, schedule, and cost across the rate-case program portfolio, thus unifying Project Plans for each of the five categories into a single Program Initiative; and

v)      Telecom, which contemplates the purchasing of equipment and components part of the fiber optic transport network, cable deployment, and configuration of Dense Wavelength Division Multiplexing (DWDM) devices to link the network's constituent components.

41.     The five categories constitute complementary and interrelated service areas specific to the data centers and network at issue.  As a result, it is inefficient (and highly unusual) for a utility to disaggregate a category of service (or a portion of work from that category) and reissue it in the form of a new tender.

**Avangrid Engages SLI to**
**Secure its Critical Infrastructure**

42.     Founded by Paulo Silva in 2007, Plaintiff SLI is a full-service technology, engineering, architecture, and consulting solutions firm.  SLI is among the leaders in many service categories, including Hyper Converged Data Center design and engineering services, and Smart Grid-AMI cyber security design and engineering. Particularly notable in its portfolio is a proprietary secure integrated private cloud architecture and design that, in or about mid-2018, SLI would formally name Ironclad$^{TM}$.

43.     In 2017, Defendant Avangrid was attempting to improve the quality and reliability of its cyber security program and its constituent transport networks in accordance with benefits

9

disclosed in various rate-case filings (the "Phase I" program).  To that end, Avangrid awarded a contract to SNC-Lavalin, a Canadian engineering firm.

44.     By early 2018, Avangrid had grown dissatisfied with SNC-Lavalin's performance. SNC-Lavalin had not yet been able to provide a working design and appeared unable to timely address problems and otherwise advance the program.  Silva, as SLI's principal, contacted Defendant David Lathrop, then Avangrid Network's Technical Security Manager, seeking an opportunity to work with Avangrid.  Silva shared with Lathrop his vision for a secure hyperconverged private platform at Avangrid.

45.     Impressed with Mr. Silva, Lathrop decided to involve SLI in an attempt to get the program back on track, and introduced Mr. Silva to SNC-Lavalin to explore whether SLI's design that would eventually manifest as Ironclad$^{TM}$ could be integrated into the Avangrid Security Program.  Because SLI was not an approved vendor of Avangrid, on or about March 1, 2018, SLI entered into an independent contractor agreement with the then-prime contractor, SNC-Lavalin.

46.     Even though initially constrained to use limited personnel already in the program, SLI was able to turn the program around.  Silva wholly reshaped the project, identifying and curing various flaws in SNC-Lavalin's original systems design package, and engaging an outside agency to provide personnel better suited to implement Silva's architecture and design.

47.     After carefully evaluating SNC-Lavalin's design, Silva realized that SLI could not employ the Ironclad$^{TM}$ design in the Avangrid Security Program without significant modification. Utilizing Silva's intellectual property and expertise, SLI identified the changes necessary to ensure the compatibility of Ironclad$^{TM}$ with the developing design.  SLI successfully completed these steps, resulting in the creation of the Avangrid Secure Domain (the "ASD").  Central to the actual operation of the ASD was the Ironclad$^{TM}$ Runbook, SLI's comprehensive, proprietary

11018316.3

compendium of, *inter alia,* blueprints, technical specifications, and equipment necessary to build and implement the Ironclad^TM design.

48.     The ASD, which established an overall architecture for securing the critical infrastructure of Avangrid, was implemented to conform and comply with hundreds of security controls, including those established by the Federal Energy Regulatory Commission ("FERC,"), the North American Electric Reliability Corporation ("NERC"), and the National Institute of Standards and Technology ("NIST").  The ASD was built to introduce value to rate-payers by allowing both consolidation and integration of data centers to and systems across several operating utility companies in the Northeast of the United States, and provided a secure and orderly path for migrating critical systems, applications, and services from a legacy infrastructure onto a 21st century secure private cloud architecture, ultimately savings rate-payers hundreds of millions of dollars.

49.     Consistent with the achievement the ASD represented, and recognizing the centrality of the Ironclad^TM Runbook and its benefit to grid security, Avangrid licensed the technology by entering into an end-user license agreement with SLI on or about February 11, 2019 (the "EULA").

50.     Notwithstanding the centrality of Silva and SLI to the ASD, SLI was not an "approved vendor" of Avangrid as to the Phase I work, and thus had to perform its pivotal work in the capacity of a subcontractor.  SNC-Lavalin was briefly displaced as the prime contractor by Defendant B&V, which itself was displaced by Defendant UTI.  In light of Silva's expertise, Avangrid encouraged SLI – a design and engineering firm – to oversee implementation of the ASD in the capacity of a sub-contractor to UTI, a systems integrator.

51.     Thus, on March 28, 2019, SLI entered into a subcontractor agreement with UTI (the "UTI Subcontractor Agreement").  Throughout the tenures of SNC-Lavalin, B&V and UTI as prime contractor, Mr. Silva, through SLI, assumed the role of Chief Security Architect of the Avangrid Security Program.

52.     The turn-around that SLI and Silva had managed to bring about was total.  The creation and implementation of the ASD was viewed by Avangrid management as a resounding success.

**Phase II of the**
**Avangrid Security Program**

53.     In light of its successful implementation of the ASD, and the completion of Phase I of the Avangrid Security Program, SLI anticipated being awarded valuable contracts related to Phase II of the project.  Entirely apart from the enthusiasm Avangrid had expressed over SLI's earlier performance, and the respect that SLI's hand-picked engineers had garnered, the ASD relied on SLI's own intricate knowledge of the Ironclad$^{TM}$ design, making SLI an obvious choice for assuming broad responsibilities in connection with the Phase II design and implementation.  SLI had already been asked to bid on a  September 11, 2018 tender, in the form of a Statement of Work, for the Optical Transfer Network -Automated Metering Infrastructure project (the OTN-AMI-SOW).

54.     The foundational services and procurement contemplated by the Phase II work was embodied in Avangrid's "Security Program II ICT Engineering RFP," and it was first proffered for bidding on February 18, 2019, in the form of RFP Tender No. 776388 (the "Original ICT Engineering RFP").  The Original ICT Engineering RFP included professional services, hardware, software, and labor, and was originally valued at $134 million.

55.      SLI, along with three competing firms – WiPro, Insight, and Accenture – made bids responsive to the Original ICT Engineering RFP between March and June 2019.  SLI made its first bid on the lucrative Original ICT Engineering RFP on or around March 18, 2019, and made a its BAFO as to the Original ICT Engineering RFP on or around April 30, 2019.  SLI would make further bids and BAFOs to progressively diminishing portions of the Original ICT Engineering RFP in the months to come, not realizing the RFPs were being refined and reissued on the basis of SLI's own bidding information, as a means of facilitating the bids of SLI's competitors.

**The Bid-Rigging Scheme**

56.      As an operator of regulated state electrical utilities, Avangrid was obligated to procure services and equipment by issuing requests for proposals, and reviewing responsive bids in an unbiased and transparent manner in accordance with statutory procurement guidelines and the United Nations Sustainability Goals in which AVANGRID participates.  Yet when conducting bidding for Phase II of the project, Avangrid did the precise opposite.

57.      As would soon become evident, Avangrid, through its subsidiary Networks, wholly subverted the bidding process.  First, it tolerated (if not encouraged) the misappropriation and sharing of SLI's confidential bidding information between Defendants PSM and Cipher, vendors that were subsidiaries of Prosegur, a Spanish company with close ties to Avangrid's parent company, Iberdrola.

58.      Second, it manipulated the bidding process to facilitate the improper bids of Prosegur subsidiaries and UTI, foreordaining the award to SLI's competitors of valuable contracts that SLI would have otherwise been awarded under a transparent and fair bidding process.

59.      Third, forgoing any pretext of competitive bidding, Avangrid and Iberdrola sole sourced to SLI's competitors dubious equipment purchases prices far in excess of those which SLI

(the owner of the design) would have charged, in order to contrive, and benefit from, capital expenditures.

60.     Silva first became aware of the ongoing Bid-Rigging Scheme in or around March 2019, when two Avangrid executives, Defendants David Lathrop and John Allen, introduced Silva to Defendant PSM, a security monitoring company then known as Viewpoint.  Viewpoint had been recently acquired by Prosegur.  Bill Reilly, a Viewpoint executive, introduced Silva to Prosegur, through which Silva was introduced to Defendant Cipher, another security firm acquired by Prosegur, and to Cipher's CEO, Defendant Ed Boucas.  Unbeknownst to Silva, Prosegur – with Avangrid's knowledge and cooperation – intended to poach from SLI lucrative Avangrid contracts through its American subsidiaries SLM and Cipher.

61.     At the encouragement of Javier Tabernero, Alejandro Alonso, and Defendant Boucas, three senior Prosegur executives with strong ties to Iberdrola, SLI agreed to explore a potential working relationship with Cipher.  Thus, on or about or about August 5, 2019, Cipher and SLI executed a Mutual Confidentiality Agreement (the "NDA") in anticipation of a possible collaborative bid for Avangrid's Original ICT Engineering RFP.

62.     Relying on the NDA, SLI provided confidential information to, *inter alia*, Cipher's Chief Financial Officer, Andre Viera Rolim, and Vice President, Troy Wachter. The information included business secrets regarding bid proposal requirements, including pricing and corporate capabilities to be offered in in support of a bid for the Original ICT Engineering RFP.

63.     SLI provided this highly confidential information to Cipher based on the NDA and Boucas's representation that the parties would work together in good faith, that Cipher would help SLI better position itself to win the contract for that Original ICT Engineering RFP, and that the parties would explore a joint bid or some other mutual business transaction.  The subsequent

14

misuse by Cipher and Prosegur of SLI's business secrets belied any notion that either company contemplated any kind of meaningful collaboration, much less a joint venture.

**The Prosegur Dashboard**

64.     Exploiting SLI's good faith, Cipher and Prosegur used SLI's proprietary information to create a comprehensive internal Prosegur "dashboard" (the "Prosegur Dashboard") in connection with the Original ICT Engineering RFP, employing SLI business secrets and confidential details concerning its methodology and business plans.  The Prosegur Dashboard contained data based on confidential SLI information concerning every aspect of the Avangrid program and was explicitly designed to help Prosegur entities win business from the Utilities Defendants on the basis of SLI's expertise, and its confidential trade secrets.

65.     The highly inappropriate Prosegur Dashboard was far more than a dossier compiling wrongly appropriated business secrets: it was a playbook brazenly detailing strategy for how best to exploit SLI's proprietary bidding information. It openly acknowledged Prosegur's coordination with the Utilities Defendants, and explicitly spelled out the strategy for establishing Prosegur's credentials and securing Avangrid's business while squeezing out Silva and SLI.

66.     Not even attempting to conceal its planned bid-pilfering, the Prosegur Dashboard *included in its entirety* SLI's 15-page bid for the Original ICT Engineering RFP, inserting Cipher's own name as a header.  A copy of SLI's original bid with the added Cipher header, as extracted from the Prosegur Dashboard, is annexed to the complaint as Exhibit A.

67.     As if the wholesale annexation of SLI's own bid were not brazen enough, the Prosegur Dashboard is breathtakingly forthright about its creators' planned misfeasance.  That much is plain from the Prosegur Dashboard's "Next Steps" page, which bears close examination, and is reprinted in its entirety, with relevant areas highlighted:

15



**Next Steps:**

1. Out of the 3 scenarios, we focus (initially) in **"Plan A" (Subcontract Scenario)**. Leaving "Plan B" (Joint Venture "LLC" Scenario) and "Plan C" (M&A Scenario) as potential future alternatives. "Plan A" give us the ability to comply w/ current tender.
   a. Action: Need to build an **argument document and Q&A** that supports the rationale behind "Plan A" (Subcontract Scenario) and that we all can use in a coordinated way internally and more important w/ Avangrid and Iberdrola. Focus in the positive reasons behind it. **Owner: Andre (w/ Legal and Troy)**

2. MoU  - **APPENDIX A - SCOPE OF SERVICES ALLOCATION:** Not sure if best approach is an allocation based in % of services and instead based in the type of service. We should be able to **show a ramp-up and ramp-down of Paulo in the project.** That way we "lock" Paulo to the project (till the end) while we show Avangrid/Iberdrola that we are progressively reducing Paulo dependency and taking control.
   a. Action: **Analyze type of services (Presales analysis) and optimal allocation** based in Cipher services current capabilitie (day 1) and "SL". Progressive transition till a % that we feel comfortable. **Owner: Troy**

3. **APPENDIX B – SUPPLIES AND EQUIPMENT**: Map infrastructures needs and **best buying/pricing negotiation capacity** (Prosegur/Cipher/Paulo) as well as **identify which technologies are need it to provide the service** versus which technologies are pure resale.
   a. Action: **List of procurement list w/ pricing quotes**, margin, "negotiation owner" (Prosegur/Cipher/Paulo). **Owner: Andre** (w/ Prosegur Corporate Procurement and Paulo)
   b. Action: **List of technologies need it to provide the service. Owner: Troy**

4. Risk & Liabilities: Understand all **risks and liabilities stated in the MSA** and also from the technical/commercial perspective (e.g. specific energy technology platforms)
   a. **List of risks and liabilities** assess identifying proposal to mitage/eliminate risk/liabilities. **Owner: Andre** (w/ Legal and

5. **Security Limits Financials:** Analyze the numbers and prepare the report w/ assessment. **Owner: Andre**

6. **Business Case:** Finalize cash flow, project P&L. **Owner: Andre**

68.    First, and notably, the "Next Steps" page speaks of the strategic importance of developing an "argument document and Q&A" supporting a rationale for confining SLI to subcontractor status, which it refers to as "Plan A."  While wanting to obtain the lucrative ICT Engineering Contract for itself and limit SLI's role, Prosegur still needed to ensure SLI's involvement, not only because it was dependent on SLI's know-how, but because, unlike SLI, neither Prosegur entity had formally entered a bid in response to the Original ICT Engineering RFP Tender 776388.

69.    More astonishing still, the "Next Steps" page openly acknowledges Prosegur's coordination with Avangrid – issuer of the RFP – and its parent, Iberdrola, wholly belying any notion that the Utility Networks conducted an unrigged bidding process; the "argument document and Q&A" were intended to be tools "we all can use in a coordinated way internally **and more important w/ Avangrid and Iberdrola**" (emphasis supplied).

16

11018316.3

70.     Paragraph 2 of the "Next Steps" page openly muses over the best strategy for developing Prosegur's own bona fides while simultaneously ensuring a diminishing role for SLI and Silva (here referred to by his first name, "Paulo") in the contemplated work.  "We should be able to **show a ramp-up and a ramp-down of Paulo in the project**" (emphasis in the original).

71.     The very fact of the Prosegur Dashboard's creation (and its unblushing, wholesale integration of SLI's bid) evidences Prosegur's willingness to employ improper means to secure business from the Utilities Defendants.  But the continuation of paragraph 2 of the "Next Steps" page vividly demonstrates (i) Prosegur's acknowledged inability to secure or perform the ICT Engineering contract without the support of Silva and SLI, (ii) the Utilities Defendants' awareness of Prosegur's dependency on Silva and SLI, and (iii) Prosegur's desire to take control of the lucrative ICT engineering work, to the exclusion of SLI:  **"That way we 'lock Paulo' to the project (till the end) while we show Avangrid/Iberdrola that we are progressively reducing Paulo dependency and taking control"** (emphasis supplied).

72.     The Prosegur Dashboard is an extraordinary document that memorializes the misfeasance central to the Bid-Rigging Scheme, and exposes its participants for the racketeers that they are.  The subsequent actions of the Utilities Defendants and the Vendor Defendants, all taken in furtherance of the Bid-Rigging Scheme, would simply confirm the pattern of misfeasance.

**The Scheme Proceeds**

73.     At that time unaware of the Prosegur Dashboard, and Prosegur's bad faith generally, SLI provided Cipher with yet additional information, including copies of SLI's financial statements, its capabilities and its bid information. The confidential information was provided under the NDA via emails, phone calls and recorded video conferences, and continued through October 2019, and beyond.

74.     In the course of the ongoing discussions with Cipher, SLI was alarmed to learn through a third-party vendor that Defendant Reilly – the Viewpoint executive who had introduced SLI to Prosegur – had been contacting SLI's vendors, seeking bid prices for the precise materials and hardware included in SLI's bid for the Original ICT Engineering RFP.  That another Prosegur company appeared to be mirroring SLI's bid strongly suggested that Cipher had failed to honor the NDA by sharing SLI's confidential bidding information with a Cipher affiliate and potential competitor of SLI.

75.     It soon became evident that Networks was not the victim of collusive bidding practices – it was a participant and a ringleader.  On or around September 25, 2019,  Networks issued a new tender – RFP no. 789546, on which SLI was not invited to bid.  Troublingly, RFP 789546 appeared to contemplate hardware, software, and professional services components substantially identical to those suggested by SLI in its bid for the Original ICT Engineering RFP. Of equal concern, especially in the teeth of SLI's exclusion from the RFP, was that SLI's competitor, Cipher affiliate Viewpoint had been invited to bid.

76.     SLI would later learn that, employing SLI's confidential bid information, Prosegur subsidiaries Viewpoint and Cipher had, in fact, coordinated to request pricing from third-party vendors for the constituent subparts of SLI's earlier bid, even before the issuance of RFP 789546 – including identical hardware, as identified by SKU bar code information.

77.     Afterward, Networks did its part by issuing a suitably tailored RFP, excluding SLI from bidding.  Tender no. 789546 appears to have been little more than a vehicle for corrupt Avangrid insiders to remove hardware and software from its original tender, refine the tender using SLI's expertise, and to serve it up to their favored vendors. To change a multi-million dollar public RFP several times – as Networks eventually did -- required tremendous awareness and

18

access control of the procurement system, and could not have been achieved without the active participation of Avangrid and Iberdrola.

78.     Understandably, SLI voiced alarm over Viewpoint's having been solicited to bid on an RFP from which SLI had been excluded, one plainly based on hardware, software, and professional services specifications contained in SLI's bid for the Original ICT Engineering RFP – bid information that SLI had shared with Cipher pursuant to the NDA under the erroneous expectation that it would be kept confidential, and would not be misappropriated and exploited for the benefit of Defendant Viewpoint.

79.     SLI decided to walk away in or around September 2019 and to cease negotiations with Prosegur and its subsidiaries. Notwithstanding that Networks had excluded SLI from bidding on what appeared to be a tailored RFP derived from SLI's own specifications, SLI still held out hope that it could be awarded the still-pending Original ICT Engineering RFP – or what was left of it – on the basis of its experience and proficiency.

**The Wrongdoing**
**Grows More Brazen**

80.     There were additional signs of Avangrid's steering bids and playing favorites with vendors. It was not uncommon for vendors to spend significant time in Avangrid's executive suites, among them, UTI executive Charlie Von Stetten. It became clear that, beginning in or around September 2018 and continuing through 2019, Avangrid executive Lathrop worked in coordination with Von Stetten to convey confidential bid information to UTI.

81.     Lathrop would habitually leave vendors' bids open on his desk. On various occasions during that period, Silva witnessed Von Stetten whispering to Lathrop, after which Lathrop would leave his office. During Lathrop's absence, Von Stetten would take notes on the bids, sometimes even photographing them with his cell phone.

82. Silva was understandably concerned about witnessing what appeared, at best, to be plain disregard for the confidential nature of bids, and at worst, a flagrant attempt to hand a competitive advantage to UTI. When Silva brought up with Lathrop his cavalier treatment of sensitive documents, and more specifically, his failure to safeguard confidential bid information, Lathrop smiled and replied, "I know nothing – I was in the bathroom."

83. Lathrop's efforts to give improper advantage to UTI was at least partly explained by a *quid pro quo*. Lathrop, approaching retirement from Avangrid, was seeking a post-retirement sinecure with an Avangrid vendor, and initially asked Silva for a position with SLI. Silva thought the request inappropriate and a possible conflict of interest, and rebuffed Lathrop.

84. UTI did not feel similarly constrained by conflict of interest principles, and offered Lathrop the post-Avangrid engagement that he had sought and that SLI had denied him. Before leaving Avangrid, Lathrop steered a multitude of procurements to UTI. In or around November 14, 2019 and December 2019, Lathrop authorized a purchase order styled "ICT7" for approximately $15 million in "ICT Additional Services." By February 2020, Lathrop had retired from Avangrid, and assumed the position of Vice President of Utilities at UTI.

85. Perhaps most critically, Lathrop facilitated the steering of procurements to UTI by providing it with a copy of SLI's Ironclad$^{TM}$ Runbook, a flagrant breach of the EULA governing Avangrid's use of the Ironclad$^{TM}$ technology it had licensed. Without the Ironclad$^{TM}$ Runbook, Lathrop would not have known what to requisition, and UTI would not have known what to procure.

86. Finally – whether in retaliation against Silva or for some other reason, on or about July 8, 2019, Lathrop provided Defendant Victorero a copy of SLI's Ironclad$^{TM}$ Runbook – another flagrant breach of the EULA.

20

87.     Avangrid's bid-rigging had never been confined to steering contracts to Prosegur subsidiaries and UTI.  On or around December 2018, Avangrid gave SLI the opportunity to bid on a $45 million Design and Engineering Services project (the "AMI-OTN SOW").  Avangrid executive Tom Fitzgerald told Silva that SLI's competition was Defendant B&V.  SLI prepared and submitted a comprehensive, 47-page proposal.

88.     SLI would later learn that Fitzgerald was appalled by B&V's significant delays, the lack of detail in its bid, and its lack of familiarity with the technical aspects of the contemplated service delivery.  Nonetheless, Avangrid wanted B&V awarded the contract.  To Silva's disbelief, two Avangrid executives – Defendants David Lathrop and John Allen – demanded that Silva share the contents of SLI's bid with B&V.  They likewise demanded that SLI not seek the outright award of the contract, but instead relegate itself to serving as a subcontractor to B&V.

89.     Silva initially refused to share SLI's bid information with B&V, but was told by the Avangrid executives that failure to share the contents of SLI's bid would ruin SLI's chances of being awarded the lucrative Original ICT Engineering RFP.  In the teeth of that threat, Silva relented, and shared SLI's bid with B&V on April 3, 2019.  SLI would later learn that B&V – well aware that it was using trade secrets extorted from SLI – used the specifications contained in SLI's bid in order to improve the B&V bid, and that B&V was ultimately awarded this lucrative, sole-source contract, despite its demonstrably inferior qualifications.

90.     B&V hardly stopped there.  In or about the Fall of 2019, Bill Bernoe, a B&V executive, unsuccessfully attempted to obtain a copy of the Ironclad$^{TM}$ Runbook through artifice, by misleadingly suggesting to one of Silva's assistants that he was authorized to possess and use it.  Suspicious, Silva's assistant refused, and reported the incident to Silva.

21

91.     The manipulation of the bidding process continued.  Prosegur wanted to revive its earlier collaboration with SLI, and Cipher's CEO, Defendant Boucas, had intimated on several occasions that the only way SLI would ever be awarded any of the remaining ICT Engineering contract would be through a partnership with Cipher because of its parent Prosegur's strong connections with Iberdrola's Chairman, Jose Ignacio Sanchez Galan, and Global Head of Security, Antonio Asenjo Martin, and Prosegur's connections in Avangrid's security department.  Defendant Rolim, Cipher's CFO, told Silva "We are so tight that we monitor the Chairman's emails to protect him; this is how tight we are in Spain . . ."

92.     On or around October 1, 2019, Boucas claimed that he possessed critical information pertaining to the Original ICT Engineering RFP and to an additional, unreleased Avangrid project – RFP No. 792241 – and again suggested that SLI would need to partner with Prosegur subsidiary Cipher as a condition of doing business with Avangrid, and of being considered for the Original ICT Engineering RFP.

93.     Soon, the suggestions turned into threats.  In a text message of the same day, Boucas stated "Paulo, I have some new relevant information about the RFP that will be important to your decision making but if I don't hear from you soon we will have to communicate to Avangrid that we are no longer partners.  So call me as soon as possible."

94.     When Silva called back, the threats became more animated.  Boucas told him, in substance, "you cannot just walk away now, you still have ICT Engineering worth $50MM!  You are a small business, think about it . . . it is better than nothing! You now know we are connected to Avangrid.  Here is what I can offer, 15% on hardware which was your original mark-up anyway. No loss. If you don't take it, you will lose it all!"

95.     Concluding it had no other options, on or about October 10, 2019, SLI reluctantly entered into an MOU with Cipher (the "MOU").  Under it, SLI would forgo a full 60% of its expected profits in order to perform the services contemplated under the Original ICT Engineering RFP worth $50MM, even though neither Cipher nor Prosegur had the know-how to deliver the Phase II services. A copy of the executed MOU was shared with Avangrid's Procurement Department on October 10, 2019.

96.     Avangrid continued to methodically disaggregate and reissue portions of the Original ICT Engineering RFP.  On or about November 13, 2019, Avangrid released the tender to which Prosegur executive Boucas had earlier alluded – RFP no. 792441 – which was limited to information communications technology ("ICT") services only.  The hardware and professional services components had earlier been removed from the Original ICT Engineering RFP and practically served up to SLI's competitors in December 2019.

97.     RFP no. 792241 sought bids for a contract worth approximately $49 million, rather than the roughly $134 million in services and equipment contemplated by the Original ICT Engineering RFP.  SLI, nonetheless, duly submitted a bid.

98.     Avangrid's bid-rigging then grew even more brazen.  To SLI's surprise, it received a third  tender – RFP No. 795776 – on February 3, 2020, after having gone through the "Best And Final Offer" stage multiple times with respect to all of the previous RFPs.  Avangrid sought an unusually fast turn-around of four days.  Silva, when preparing a bid on SLI's behalf, realized that ICT Engineering Tender 795776 sought proposals for services that had been the subject of previous tenders issued after the submission of best and final offers.

99.     Because it was irregular for an RFP to be reissued several times after the receipt of best and final offers, Silva contacted Tamara Jones-Smith at Networks, and learned that RFP

Tender 792241 had in fact been reissued as RFP No. 795776, and later found out that Prosegur subsidiary Viewpoint had been invited to bid against SLI even though Avangrid's procurement department had received a legal and written notification that Prosegur s subsidiary Cipher had officially partnered with SLI pursuant to the MOU.  This, in combination with Avangrid's having sought an unusually fast turn-around of four days, led Silva to conclude that Iberdrola and Avangrid, once again, were engineering the delivery of a contract to a favored Prosegur company.

100.    Knowing that Prosegur and its recently acquired subsidiaries in the U.S. had an inside track with Avangrid and Iberdrola regarding the RFP award process – and hoping to claim at least a portion of the work it had earlier bid on – SLI, honoring the MOU, shared its bid materials for RFP no. 795776 with Cipher on or about February 7th, 2020, the same day bids were due. Defendant Rolim, Cipher's CFO, requested a meeting with Silva on that same date.

101.    During the meeting, Rolim formally disclosed that Cipher affiliate (and Prosegur subsidiary) Viewpoint had also been invited to bid on RFP tender no. 795776, and pointedly suggested that SLI abandon its attempt to become prime contractor by allowing a Prosegur subsidiary to bid lower on the ICT Engineering Contract, and that SLI forgo the control and profits that would have come with the prime contractor designation. Not bothering to conceal Prosegur's insider status, Rolim proposed that SLI agree to be a subcontractor on Viewpoint's bid for RFP No. 795776, which Viewpoint would submit using the SLI bid pricing and information SLI had provided Cipher pursuant to the MOU.  In a separate phone conversation, Rolim made clear to Silva that if he did not accede to Rolim's request, SLI would forfeit the prospect of being awarded the contract.

102.    SLI refused to assume a subcontractor role, and objected to any further use if its confidential information by Cipher or Viewpoint on additional bids on Avangrid RFPs.  By that

point, however, with the assistance of the Utilities Defendants, Prosegur entities had managed to capture, through improper means, substantial amounts of business that SLI had hoped to win legitimately.

103.    In conducting the Bid-Rigging Scheme, the Utilities Defendants abandoned any pretext of conducting a fair procurement process, flouting their own internal guidelines, as well as fundamental notions of transparency governing RFPs issued in connection with PUC-approved rate-cases.  The Utilities Defendants not only openly favored SLI's competitors; they awarded those competitors contracts on the basis of bids restyled to incorporate SLI's trade secrets, to lend the inferior bids a veneer of legitimacy, to give the appearance of a normal bidding process, and to conceal their own wrongdoing.

104.    SLI became an Avangrid approved vendor for the purposes of the Phase II work. Consistent with the Utilities Defendants' requirements, SLI obtained letters of credit and insurance, and began to hire staff in anticipation of performing the roll out of its own technology in respect of the Phase II work.  At all times during the relevant period, SLI stood ready to perform the work, was capable of performing the work, and was the most qualified vendor to perform the work.

105.    But for the Bid-Rigging Scheme, and the resulting subversion of the bidding process, SLI would have been awarded millions of dollars in lucrative business wrongly steered to SLI's competitors.

**The Waste And Abuse**
**Of CAPEX Expenditures**

106.    The Bid-Rigging Scheme surely injured SLI and enriched its competitors.  But in time, it became obvious why the Utilities Defendants were engaging vendors ill-suited for the

contracts they received, and sole-sourcing unnecessary procurements at premium prices through those vendors.

107.    In light of the regulatory rate structure governing public utilities, the Utilities Defendants saw the inflation of capital expenses as a dependable basis for ensuring short term profit and increasing shareholder value.

108.    In addition, the characterization of gratuitous investments in infrastructure as legitimate CAPEX provided Avangrid with a pretext for seeking rate increases to which they were not otherwise entitled, along with depreciation benefits they did not deserve.

109.    Given the ability to goose their own profits by channeling funds into capital expenditures – regardless of whether such investments improved network infrastructure or inured to the benefit of rate-paying consumers in any way – the Utilities Defendants sought to find any possible means of contriving, and inflating, CAPEX.  Instead of making prudent and reasonable investments intended to upgrade infrastructure and benefit rate-paying customers, the Utilities Defendants, putting shareholder value ahead of any other concerns, sought to exploit the procurement process to accommodate their strategic booking of capital expenses.

110.    The Utilities Defendants conceived of the Bid-Rigging Scheme to achieve just those goals.  But to implement the Bid-Rigging Scheme, the Utilities Defendants needed pliant vendors to assist them in achieving their bloated capital expenditure targets.

111.    SLI, having itself designed the ASD and created the Ironclad[TM] technology, would have been the obvious contractor for the Utilities Defendants to choose to procure necessary equipment and support services.  But the Utilities Defendants knew that SLI would not assist them – knowingly or otherwise – in their goal of inflating CAPEX.

26

112.    SLI only recommended procurements that were necessary to maintaining the ASD it had spearheaded, and to ensuring the continuing efficacy of the Ironclad™ technology around which the ASD was designed.  In fact, SLI had communicated concerns regarding purchases of PIVOT3 equipment in the fourth quarter of 2018 that were excessive and unjustified because not enough personnel were made available to adequately implement these products, resulting in waste as products began to experience lifecycle depreciation or obsolescence without ever being fully utilized.

113.    Yet more inconveniently – and as well-known both to the Utilities Defendants and the Vendor Defendants – SLI made procurements on a straightforward, open book contract basis, with a fixed margin of 15%, providing no ready channel for the CAPEX inflation the Utilities Defendants sought.  The Utilities Defendants thus turned to the Vendor Defendants, contractors that were wholly aware that the Utilities Defendants wanted to inflate CAPEX, and were happy to assist them in the Bid-Rigging Scheme.

**The CAPEX Premiums**

114.    To accommodate the Utilities Defendants (and to enrich themselves), the Vendor Defendants unblushingly charged remarkable premiums of 40-65% on procurements (the "CAPEX Premiums") that they presented on non-standard and poorly documented invoices.  The Vendor Defendants did not purport to supply any additional value or to otherwise provide any meaningful basis for charging the CAPEX Premiums to the Utilities Defendants.  Indeed, the Vendor Defendants lacked meaningful technical familiarity with Ironclad™ and the ASD – whose architecture and operation should have been the only variables informing procurement decisions.

115.    But the Vendor Defendants stood to profit greatly from Avangrid's seemingly limitless appetite for making capital expenditures and had little reason to serve as a check against

overequipping and overbuilding, making them ideal partners in the Bid-Rigging Scheme in the absence of a Design and Engineering firm and the lack of any meaningful procurement oversight.

116.    The Bid-Rigging Scheme achieved its central goal.   That much is clear from Avangrid's own 10-K filings, which demonstrate that Avangrid increased its CAPEX from $1.777 billion in 2018 to $2.735 billion in 2019, ***an increase of nearly one billion dollars.***

117.    The procurements resulting from the Bid-Rigging Scheme were never designed to benefit rate-payers.   More remarkably, the Utilities Defendants did not even purport to advance a pretext for the legitimacy of the cynical and profligate purchases they made.

118.    The primacy of inflating CAPEX was revealed, *inter alia,* by the award of contracts to Vendor Defendants for work well outside of the service categories in which they were historically known to have experience, much less competence.

119.    Defendant B&V is a civil engineering firm that would normally be engaged for services falling within the Civil Engineering and Construction Service Category.   Mystifyingly, B&V was awarded a primary contract to assume responsibility for Program Management in the Corporate Security Program – including complex CAPEX/OPEX accounting calculations – despite its lack of accounting or financial management expertise.

120.    Likewise, Defendant UTI is a company that primarily installs and maintains video cameras to monitor large facilities.   It has no particular expertise, much less experience, in designing or building private cloud data centers or in cloud systems integration.   Yet throughout 2018 and 2019, Avangrid authorized UTI to hire over thirty full-time equivalent contractors to provide Design and Engineering Services with respect to such data centers.

11018316.3

121.    UTI was also selected by Avangrid to provide both Systems Integrations and Design & Engineering services, and tasked with building a critical facility – the core ICT Disaster Recovery Site, a complicated undertaking for which UTI was self-evidently unsuited.

122.    For its part, Prosegur is a physical security company that would normally engage in the installation of video cameras, and provide physical security and monitoring services.  It has neither particular expertise in hardware and software sourcing nor in Design and Engineering Services.  Yet Prosegur entities were repeatedly chosen to bid on contracts requiring largescale hardware acquisitions they were self-evidently unqualified to undertake and were awarded numerous sole-source contracts for related procurements and personnel.

123.    The Utilities Defendants knowingly collaborated with the Vendor Defendants to procure a mountain of radically overpriced hardware – including scores of routers and multiplexing units that, curiously, they took pains to unpack and install in racks – as if to vaguely suggest that they were configured and operational.  Yet those units were never put into service, are quickly growing obsolete. and are depreciating by the day.

124.    Yet more cynically, the Utilities Defendants actually paid to have structures erected to house the dust-gathering hardware that lacked any discernable purpose (apart from serving as a vehicle for the Utilities Defendants' accounting misfeasance).

125.    The Utilities Defendants acquired tens of millions of dollars of overpriced and/or unnecessary hardware such as Thermo Bond Buildings units purchased excessively in connection with the design and implementation of the ASD.  The equipment purchases were invariably sole source to UTI, at premium prices. The same equipment, however, could have been purchased directly from SLI using SLI's straight pass-through 15% open book contract for all hardware in the Ironclad™ design.

126.    To accommodate the profligate spending, UTI has expanded its warehouse three times in the past 3-4 years, all to store tens of millions of dollars in hardware equipment purchased to achieve CAPEX allocation targets instead of conforming to technology lifecycle principles that would have otherwise prevented waste.  As a result, the warehouse contains equipment that has been in storage for years, remains unused, and is depreciating daily.

127.    In the fourth quarter of 2018 and the first quarter of 2019, Avangrid engaged UTI and Nokia to procure tens of millions of dollars in Nokia Dense Wavelength Division Multiplexing (DWDM) equipment at premium prices, and with no competition.  Much of the equipment remained as of January 2021 in storage in UTI warehouses in Maine and New York.

128.    Likewise, at the Utilities Defendants' behest, during the fourth quarters of 2018 and 2019, UTI procured Nokia, CISCO, and PIVOT3 equipment in wildly excessive quantity, resulting in warehoused equipment far out alignment with any technical justification.  Similarly (and again, through UTI) the Utilities Defendants purchased excessive amounts of data storage, all at premium prices, with a two-year half-life that all but ensured that the storage would never be utilized.

129.    In 2017 and 2018, the Utilities Defendants paid for a variety of unnecessary software systems at premium prices.  The Utilities Defendants later paid for the renewal of the licenses, despite the fact that the systems were never fully configured or put into service.

130.    Likewise, in the first quarter of 2019, the Utilities Defendants awarded Defendant B&V a $34 million sole-source contract in connection with the AMI-OTN data center convergence project.  Personnel were hired directly through B&V to support a $1.5 billion automated metering infrastructure initiative.  B&V billed (and the Utilities Defendants paid) for contractors at premium hourly rates well in excess of the rates offered by SLI.

11018316.3

131.    There is perhaps no starker an example of CAPEX abuse than Avangrid's procurement of PIVOT3 equipment.  In 2018, Avangrid paid Defendant UTI $37,323 per unit for PIVOT3 HyperV Devices.  A comparison of SKU numbers reveals that, in 2019, Avangrid paid UTI an astonishing $124,245.33 per unit for substantially identical HyperV Devices, with a minor upgrade that should only have justified a minor price increase.

132.    The Bid-Rigging Scheme resulted in bloated, questionable capital investments with no seeming relation to actual infrastructural needs.  While the Bid-Rigging Scheme enriched the Utilities Defendants and the Vendor Defendants, it also injured rate-paying consumers, who ought to have enjoyed the lower costs that competitive bidding and non-contrived infrastructure would have afforded them.  It likewise injured competitors, especially SLI, which was denied, and thus unable to profit from, contracts that its qualifications would otherwise have entitled it to win.

133.    Finally, because many of the bloated expenditures were made in connection with the Avangrid Secure Domain and OSG-Telecom, they had an additional, pernicious effect: providing industry with the erroneous impression that employing Ironclad$^{TM}$ technology was inefficient and costly, thereby diminishing the perceived value of one of SLI's principal assets, and damaging SLI's business prospects generally.

*          *          *

134.    As with other corporate strategy, the Bid-Rigging Scheme was established by Avangrid's parent, Iberdrola – and more specifically, by Defendant Asenjo Martin and his lieutenant, Defendant Victoreo, both of whom oversaw corporate security in general, and directly managed the Corporate Security Departments at both Avangrid and Networks.  Asenjo Martin was indicted in Spain and Victorero put under investigation by the Spanish high Courts for corporate

espionage and procurement fraud.  It is hardly a surprise that Defendants Asenjo Martin and Victorero were the architects of the Bid-Rigging Scheme.

135.    Defendants Asenjo Martin and Victoreo exercised complete control and oversight of the very Corporate Security Departments making the profligate purchases permitted by the craven manipulation of Avangrid's bidding process.  The Bid-Rigging Scheme could not have taken place, and did not take place, without the blessing, if not the imprimatur, of Asenjo Martin and Victoreo.

## CLAIMS FOR RELIEF

### First Cause of Action

### CIVIL RICO BASED ON CERTAIN DEFENDANTS' PARTICIPATION IN THE AFFAIRS OF NETWORKS

*(As against Defendants Iberdrola, Avangrid, B&V, Prosegur, Cipher, Lathrop, Allen, Boucas, and Rolim)*

136.    SLI repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 135 above.

137.    At all times during the Relevant Period, Networks was an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) that was engaged in, or the activities of which affected, interstate or foreign commerce.

138.    At all times during the Relevant Period, Networks purported to maintain procedures necessary to protect the integrity of Avangrid's procurement process, and to ensure that potential contractors and service providers be selected on the basis of a fair and impartial evaluation of the technical merit of their  proposals.  These procedures required bidders seeking the award of procurement contracts to provide proposals including information sufficient in scope and detail to

demonstrate whether the bidder had the necessary capability, experience, knowledge, expertise and financial strength to perform the contracts satisfactorily.

139.    At all relevant times, Defendants Iberdrola, Avangrid, Lathrop and Allen (the "Networks Control Defendants"), and Defendants Prosegur, Cipher, B&V, Boucas, and Rolim (the "Networks Vendor Defendants," and collectively with the Networks Control Defendants, the "Networks Enterprise Defendants") were associated with Networks through their participation in and their direct and/or indirect control over the affairs of Networks, including, without limitation, the issuance of RFPs by Networks, and the resulting award of procurement contracts to bidders advancing proposals in response to those RFPs.

140.    The means by which the Networks Enterprise Defendants exercised influence and control over, and participated in, the affairs of Networks included, but were not limited to, (i) the procurement by the Networks Control Defendants of SLI's proprietary bidding information; (ii) the unauthorized use by the Networks Control Defendants of SLI's proprietary bidding information in order to refine their RFPs and to convey to the Network Vendor Defendants and other of SLI's competitors how they should style proposals submitted in response to such RFPs; (iii) the misappropriation, by extortion or theft, by the Networks Vendor Defendants of SLI's business secrets; (iv) the wrongful and unauthorized use by the Networks Vendor Defendants of SLI's trade secrets in the preparation of bids to be submitted by or on behalf of the Networks Vendor Defendants under the false pretense that such proposals were prepared based upon the capability experience, knowledge, and expertise of the Networks Vendor Defendants; and (v) the award, by the Networks Control Defendants of contracts in response to bids from the Network Vendor Defendants and other of SLI's competitors that the Networks Control Defendants knew were based on the misappropriated trade secrets of SLI.

33

141.     The Networks Enterprise Defendants influenced, participated and controlled the affairs of Networks through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962(c).  The conduct and acts of the Networks Enterprise Defendants are related to each other as parts of a common or shared purpose, intent and economic motive, namely, to violate and circumvent the legitimate, authorized bidding procedures of Networks in order to control the award of procurement contracts for the respective financial benefit (i) of the Networks Vendor Defendants, through their receipt of lucrative services and procurement contracts, and (ii) of Iberdrola and Avangrid, through their access to a manipulatable source of CAPEX.

142.     The pattern of racketeering activity of the Networks Enterprise Defendants during the Relevant Period consisted, *inter alia,* of acts chargeable under New York law and punishable by imprisonment under such law for more than one year and which fall within the scope of 18 U.S.C. §§ 1961(l)(A) and (5).

143.     Such chargeable acts included larceny by extortion, as proscribed, *inter alia,* by New York Penal Law § 155.05(2)(e), in that certain of the Networks Enterprise Defendants, with intent to appropriate the property of SLI to a third party, wrongfully induced SLI to deliver the property to that third-party by instilling a fear in SLI that, failing the delivery of such property, they or another would damage SLI in its property.

144.     Individual chargeable acts under New York Penal Law § 155.05(2)(e) include, *inter alia,* the following:

vi)     With the intent to wrongfully appropriate SLI's property to a third person, Defendants Lathrop and Allen compelled or induced SLI, *inter alia*, to provide Defendant B&V with SLI's bid information for the AMI-OTN-SOW as a condition of obtaining any of the AMI-OTN-SOW work to which SLI otherwise would have been entitled on the basis of its proposal.

vii)    With the intent to wrongfully appropriate SLI's property to a third person, Defendant Boucas compelled or induced SLI, *inter alia,* to share its

34

business secrets with Prosegur subsidiary Cipher as a condition of obtaining any of the Original ICT Engineering RFP work to which SLI otherwise would have been entitled on the basis of its proposal.

145.     The pattern of racketeering activity of the Networks Enterprise Defendants also included numerous acts perpetrated during the Relevant Period that are indictable under 18 U.S.C. § 1951 (relating to interference with commerce by threats or violence) and which fall within the scope of 18 U.S.C. §§ 1961(1)(B) and (5), in that certain of the Networks Enterprise Defendants, through the wrongful use of fear of economic loss, induced or attempted to induce, or conspired to induce or to attempt to induce SLI, with its consent, to part with property in such a way as to adversely affect interstate commerce.

146.     SLI's trade secrets relate to services used in and intended for use in interstate commerce.

147.     Individual indictable acts under 18 U.S.C. § 1951 include, *inter alia,* the following:

i)      By wrongfully causing SLI to fear that it would otherwise be barred from obtaining any of any of the AMI-OTN-SOW work to which it would have been entitled on the basis of its proposal, Defendants Lathrop and Allen induced SLI, with its consent, to provide Defendant B&V with SLI's bid information for the AMI-OTN-SOW.

ii)     By wrongfully causing SLI to fear that it would otherwise be barred from obtaining any of any of the Original ICT Engineering RFP work to which it would have been entitled on the basis of its proposals, Defendant Boucas induced SLI, with its consent, to share its business secrets with Prosegur subsidiary Cipher.

iii)    By wrongfully causing SLI to fear that it would otherwise be barred from obtaining any of any of the Original ICT Engineering RFP work to which it would have been entitled on the basis of its proposals, Defendant Prosegur conspired with Defendant Boucas to induce SLI, with its consent, to share its business secrets with Prosegur subsidiary Cipher.

iv)     By wrongfully causing SLI to fear that it would otherwise be barred from obtaining any of any of the work contemplated by RFP No. 795776, Defendant Rolim attempted to induce SLI, with its consent, to withdraw its

35

bid for that work, and to agree to serve as Defendant PSM's sub-contractor in connection with that work.

v)    By wrongfully causing SLI to fear that it would otherwise be barred from obtaining any of any of the work contemplated by RFP No. 795776, Defendant Prosegur conspired with Defendant Rolim to attempt to induce SLI, with its consent, to withdraw its bid for that work, and to agree to serve as Defendant PSM's sub-contractor in connection with that work.

148.    The pattern of racketeering activity of the Networks Enterprise Defendants likewise included numerous acts perpetrated during the Relevant Period that are indictable under 18 U.S.C. § 1832 (relating to theft of trade secrets) and which fall within the scope of 18 U.S.C. §§ 1961(1)(B) and (5), in that certain of the Networks Enterprise Defendants, with intent to convert a trade secret related to a service produced for interstate commerce, to the economic benefit of anyone other than the trade secret's owner, and knowing that the offense will injure the trade secret's owner, knowingly and without authorization delivered, transmitted, replicated or conveyed that information, or attempted to appropriate that information by artifice or deception, or received or possessed that information, knowing it to have been obtained without authorization.

149.    SLI's trade secrets relate to services used in and produced for use in interstate commerce.

150.    Individual indictable acts under 18 U.S.C. § 1832 include, *inter alia,* the following:

i)    Defendant Lathrop, with intent to convert a trade secret to the economic benefit of Defendants Victorero and Iberdrola, and knowing that such conversion would injure SLI, knowingly delivered and/or transmitted without authorization a copy of the Ironclad$^{TM}$ Runbook to Defendant Victorero.

ii)    Defendant Victorero, with intent to convert a trade secret to the economic benefit of himself and Iberdrola, and knowing that such conversion would injure SLI, knowingly received a copy of the Ironclad$^{TM}$ Runbook, knowing the same to have been obtained without authorization.

iii)    Defendant Lathrop, with intent to convert a trade secret to the economic benefit of Defendant UTI, and knowing that such conversion would injure

SLI, knowingly caused to be copied, and delivered and/or transmitted without authorization a copy of the Ironclad$^{TM}$ Runbook to Defendant UTI.

iv)   Defendant UTI, with intent to convert a trade secret to the economic benefit of itself, and knowing that such conversion would injure SLI, knowingly received a copy of the Ironclad$^{TM}$ Runbook, knowing the same to have been obtained without authorization.

v)    Defendants Rolim and Cipher, with intent to convert a trade secret to the economic benefit of Defendants Cipher, PSM and Prosegur, and knowing that such conversion would injure SLI, knowingly replicated without authorization SLI's trade secrets and placed them on the Prosegur Dashboard.

vi)   Defendants Cipher, PSM and Prosegur, with intent to convert a trade secret to the economic benefit of themselves, and knowing that such conversion would injure SLI, knowingly possessed SLI's trade secrets by incorporating them into the Prosegur Dashboard, knowing them to have been obtained without authorization.

vii)  Defendant B&V, with intent to convert a trade secret to the economic benefit of itself, and knowing that such conversion would injure SLI, knowingly replicated without authorization SLI's trade secrets and incorporated them into its bid for the OTN-AMI-SOW.

viii) Defendant B&V, with intent to convert a trade secret to the economic benefit of itself, and knowing that such conversion would injure SLI, knowingly attempted to appropriate a copy of the Ironclad$^{TM}$ Runbook by deception and artifice.

ix)   Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about December 11, 2018 in its bid made in response to the OTN-AMI-SOW.

x)    Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about April 3, 2019 its bid made in response to the OTN and NY- AMI Combined Site Engineering Services SOW.

xi)     Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about March 18, 2019 in its bid in response to RFP Tender No. 776388.

xii)    Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about April 30, 2019 in its BAFO in response to RFP Tender No. 776388.

xiii)   Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about October 3, 2019 in its bid in response to RFP Tender No. 789546.

xiv)    Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about November 12, 2019 in its bid in response to RFP Tender No. 792241.

xv)     Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about November 13, 2019 in its BAFO in response to RFP Tender No. 792241.

xvi)    Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary

38

bid submission templates, and other trade secrets SLI supplied on or about February 7, 2020 in its BAFO in response to RFP Tender No. 795776.

xvii)   Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about April 6, 2020 in its bid in response to RFP Tender No. 798582.

xviii)  Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about April 8, 2020 in its BAFO in response to RFP Tender No. 798582.

151.   The pattern of racketeering activity of the Networks Enterprise Defendants additionally included numerous acts perpetrated during the Relevant Period which are indictable under 18 U.S.C. § 1343 (relating to wire fraud) and which fall within the scope of 18 U.S.C. §§ 1961(1)(B) and (5), in that certain of Networks Enterprise Defendants, intending to obtain property by fraudulent pretenses, caused to be transmitted by wire communication in interstate commerce, writings specifically intended to further their fraudulent scheme.

152.   Defendants Iberdrola and Avangrid caused Defendant Networks to use interstate wires to issue RFPs to, *inter alia,* SLI, with no intention of considering the award of the contracts to SLI.  Defendants Iberdrola and Avangrid did not intend the RFPs to serve as a vehicle for assessing SLI's qualifications for the award of each relevant contract to SLI, but rather, as a fraudulent solicitation intended to elicit and misappropriate the trade secrets of SLI as a means of aiding SLI's competitors, of enriching themselves through the CAPEX that those competitors would provide, and of aiding in the furtherance and/or concealment of the Network Enterprise

Defendants' scheme to interfere with the legitimate procedures of Networks for the award of contracts.

153. Individual indictable acts under 18 U.S.C. § 1343 include, *inter alia,* the following:

i)  At 5:43 am on February 18, 2019, Iberdrola and Avangrid caused Networks to  transmit RFP Tender No. 776388 to, *inter alia*, SLI, in order to obtain, by fraudulent pretenses, property in the form of SLI's prices and proprietary bid submission templates, and other trade secrets.

ii)  At 3:06 pm on September 25, 2019, Iberdrola and Avangrid caused Networks to  transmit RFP Tender No. 789546 to, *inter alia*, SLI, in order to obtain, by fraudulent pretenses, property in the form of SLI's prices and proprietary bid submission templates, and other trade secrets.

iii)  At 3:03 am on November 13, 2019, Iberdrola and Avangrid caused Networks to  transmit Tender No. 792241 to, *inter alia*, SLI, in order to obtain, by fraudulent pretenses, property in the form of SLI's prices and proprietary bid submission templates, and other trade secrets.

iv)  At 4:56 am on Monday, February 3, 2020, Iberdrola and Avangrid caused Networks to  transmit RFP Tender No. 795776 to, *inter alia*, SLI, in order to obtain, by fraudulent pretenses, property in the form of SLI's prices and proprietary bid submission templates, and other trade secrets.

v)  At 6:54 am on April 5, 2020, Iberdrola and Avangrid caused Networks to transmit RFP Tender No. 798582 to, *inter alia*, SLI, in order to obtain, by fraudulent pretenses, property in the form of SLI's prices and proprietary bid submission templates, and other trade secrets.

154. The conduct of the scheme to rig the bidding of Avangrid's procurement contracts through a pattern of racketeering activity (the "Networks Enterprise Scheme") was continuous. The Networks Enterprise Scheme took place between 2018 and 2020, involved multiple acts of theft, extortion and fraud, was directed at numerous procurement contracts, and caused numerous separate and distinct injuries.

155. By means of the foregoing violations of RICO, Plaintiff was injured in its business and property in an amount in excess of $36.6 million.

**Second Cause of Action**

**CIVIL RICO CONSPIRACY**

***(As against Defendants Iberdrola, Avangrid, Prosegur, Cipher, PSM, UTI,
B&V, Lathrop Victorero, Asenjo Martin, Allen, Boucas, Rolim, Fitzgerald and Reilly)***

156.     SLI repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 155 above.

157.     Defendants Iberdrola, Avangrid, Prosegur, Cipher, PSM, UTI, B&V, Lathrop Victorero, Asenjo Martin, Allen, Boucas, Rolim, Fitzgerald and Reilly (the "Networks Enterprise Conspirators") conspired to commit the violations of 18 U.S.C. § 1962(c) alleged in paragraphs 136 through 155 above.

158.     At all relevant times, the Networks Enterprise Conspirators agreed and conspired to participate, directly and indirectly, in the conduct of Networks through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

159.     The Networks Enterprise Conspirators committed and/or caused to be committed a series of overt acts in furtherance of the conspiracy alleged herein and to effect the objectives of the Networks Enterprise Scheme, each member Defendant knowing the general nature of the conspiracy and that the conspiracy extended beyond that Defendant's role.

160.     By means of the foregoing violations of RICO, SLI was injured in its business and property in an amount in excess of $36.6 million.

**Third Cause of Action**

**CIVIL RICO BASED ON CERTAIN DEFENDANTS'
ASSOCIATION-IN-FACT AS A CRIMINAL ENTERPRISE**

***(As against Defendants Iberdrola, Avangrid, B&V,
Prosegur, Cipher, Lathrop, Allen, Boucas and Rolim)***

161.     SLI repeats and realleges, as if fully set forth hereto, the allegations contained in

41

paragraphs 1 through 160 above.

162.    At all relevant times, Defendants Iberdrola and Avangrid, Lathrop and Allen (the "Control Defendants"), and Defendants Prosegur, Cipher, B&V, Boucas and Rolim (the "Vendor Defendants," and collectively with the Control Defendants, the "Core Enterprise Defendants") were associated with each other to form an association-in-fact which was an "enterprise" (the "Bid-Rigging Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and which was engaged in, or the activities of which affected, interstate or foreign commerce.

163.    The Bid-Rigging Enterprise continued as a unit with a core of the same membership as an ongoing combination from 2018 to 2020.

164.    At all relevant times, the Core Enterprise Defendants participated in the conduct of the Bid-Rigging Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962 (c).

165.    At all times during the Relevant Period, Networks purported to maintain procedures necessary to protect the integrity of Avangrid's procurement process, and to ensure that potential contractors and service providers be selected on the basis of a fair and impartial evaluation of the technical merit of their  proposals.  These procedures required bidders seeking the award of procurement contracts to provide proposals including information sufficient in scope and detail to demonstrate whether the bidder had the necessary capability, experience, knowledge, expertise and financial strength to perform the contracts satisfactorily.

166.    The conduct and acts of the Core Enterprise Defendants are related to each other as parts of a common or shared purpose, intent and economic motive, namely, to violate and circumvent the legitimate, authorized bidding procedures that Networks undertook on behalf of Avangrid, in order to control the award of procurement contracts for the respective financial

42

benefit of the Core Enterprise Defendants. The financial interests of the Bid-Rigging Enterprise were served by the misappropriation of the trade secrets of SLI to facilitate the diversion of awards from SLI to other bidders, and to provide financial benefits to (i) the Vendor Defendants and other of SLI's competitors, through the grant of lucrative services and procurement contracts they would not have otherwise been awarded, and (ii) to Iberdrola and Avangrid, by providing them access to a manipulatable source of CAPEX.

167.    The illicit assistance provided by the Core Enterprise Defendants included, *inter alia,* (i) the procurement by the Control Defendants of SLI's proprietary bidding information; (ii) the unauthorized use by the Control Defendants of SLI's proprietary bidding information in order to refine their RFPs and to convey to the Vendor Defendants and other of SLI's competitors how they should style proposals submitted in response to such RFPs; (iii) the misappropriation, by extortion or theft, by the Vendor Defendants of SLI's business secrets; (iv) the wrongful and unauthorized use of by the Vendor Defendants of SLI's trade secrets in the preparation of bids to be submitted by or on behalf of the Vendor Defendants under the false pretense that such proposals were prepared based upon the capability experience, knowledge and expertise of the Vendor Defendants; and (v) the award, by the Control Defendants of contracts in response to bids from the Vendor Defendants and other of SLI's competitors that the Control Defendants knew were based on the misappropriated trade secrets of SLI.

168.    The pattern of racketeering activity of the Core Enterprise Defendants during the Relevant Period consisted, *inter alia,* of acts chargeable under New York law and punishable by imprisonment under such law for more than one year and which fall within the scope of 18 U.S.C. §§ 1961(l)(A) and (5).

169.     Such chargeable acts included larceny by extortion, as proscribed, *inter alia,* by New York Penal Law § 155.05(2)(e), in that certain of the Core Enterprise Defendants, with intent to appropriate the property of SLI to a third party, wrongfully induced SLI to deliver the property to that third-party by instilling a fear in SLI that, failing the delivery of such property, they or another would damage SLI in its property.

170.     Individual chargeable acts under New York Penal Law § 155.05(2)(e) include, *inter alia,* the following:

i)       With the intent to wrongfully appropriate SLI's property to a third person, Defendants Lathrop and Allen compelled or induced SLI, *inter alia*, to provide Defendant B&V with SLI's bid information for the AMI-OTN-SOW as a condition of obtaining any of the AMI-OTN-SOW work to which SLI otherwise would have been entitled on the basis of its proposal.

ii)      With the intent to wrongfully appropriate SLI's property to a third person, Defendant Boucas compelled or induced SLI, *inter alia,* to share its business secrets with Prosegur subsidiary Cipher as a condition of obtaining any of the Original ICT Engineering RFP work to which SLI otherwise would have been entitled on the basis of its proposal.

171.     The pattern of racketeering activity of the Core Enterprise Defendants also included numerous acts perpetrated during the Relevant Period that are indictable under 18 U.S.C. § 1951 (relating to interference with commerce by threats or violence) and which fall within the scope of 18 U.S.C. §§ 1961(1)(B) and (5), in that certain of the Core Enterprise Defendants, through the wrongful use of fear of economic loss, induced or attempted to induce, or conspired to induce or to attempt to induce SLI, with its consent, to part with property in such a way as to adversely affect interstate commerce.

172.     SLI's trade secrets relate to services used in and intended for use in interstate commerce.

173.     Individual indictable acts under 18 U.S.C. § 1951 include, *inter alia,* the following:

44

i)    By wrongfully causing SLI to fear that it would otherwise be barred from obtaining any of any of the AMI-OTN-SOW work to which it would have been entitled on the basis of its proposal, Defendants Lathrop and Allen induced SLI, with its consent, to provide Defendant B&V with SLI's bid information for the AMI-OTN-SOW.

ii)   By wrongfully causing SLI to fear that it would otherwise be barred from obtaining any of any of the Original ICT Engineering RFP work to which it would have been entitled on the basis of its proposals, Defendant Boucas induced SLI, with its consent, to share its business secrets with Prosegur subsidiary Cipher.

iii)  By wrongfully causing SLI to fear that it would otherwise be barred from obtaining any of any of the Original ICT Engineering RFP work to which it would have been entitled on the basis of its proposals, Defendant Prosegur conspired with Defendant Boucas to induce SLI, with its consent, to share its business secrets with Prosegur subsidiary Cipher.

iv)   By wrongfully causing SLI to fear that it would otherwise be barred from obtaining any of any of the work contemplated by RFP No. 795776, Defendant Rolim attempted to induce SLI, with its consent, to withdraw its bid for that work, and to agree to serve as Defendant PSM's sub-contractor in connection with that work.

v)    By wrongfully causing SLI to fear that it would otherwise be barred from obtaining any of any of the work contemplated by RFP No. 795776, Defendant Prosegur  conspired with Defendant Rolim to attempt to induce SLI, with its consent, to withdraw its bid for that work, and to agree to serve as Defendant PSM's sub-contractor in connection with that work.

174.   The pattern of racketeering activity of the Core Enterprise Defendants likewise included numerous acts perpetrated during the Relevant Period that are indictable under 18 U.S.C. § 1832 (relating to theft of trade secrets) and which fall within the scope of 18 U.S.C. §§ 1961(1)(B) and (5), in that certain of the Core Enterprise Defendants, with intent to convert a trade secret related to a service produced for interstate commerce, to the economic benefit of anyone other than the trade secret's owner, and knowing that the offense will injure the trade secret's owner, knowingly and without authorization delivered, transmitted, replicated or conveyed that

information, or attempted to appropriate that information by artifice or deception, or received or possessed that information, knowing it to have been obtained without authorization.

175.   SLI's trade secrets relate to services used in and produced for use in interstate commerce.

176.   Individual indictable acts under 18 U.S.C. § 1832 include, *inter alia,* the following:

i)    Defendant Lathrop, with intent to convert a trade secret to the economic benefit of Defendants Victorero and Iberdrola, and knowing that such conversion would injure SLI, knowingly delivered and/or transmitted without authorization a copy of the Ironclad$^{TM}$ Runbook to Defendant Victorero.

ii)   Defendant Victorero, with intent to convert a trade secret to the economic benefit of himself and Iberdrola, and knowing that such conversion would injure SLI, knowingly received a copy of the Ironclad$^{TM}$ Runbook, knowing the same to have been obtained without authorization.

iii)  Defendant Lathrop, with intent to convert a trade secret to the economic benefit of Defendant UTI, and knowing that such conversion would injure SLI, knowingly caused to be copied, and delivered and/or transmitted without authorization a copy of the Ironclad$^{TM}$ Runbook to Defendant UTI.

iv)   Defendant UTI, with intent to convert a trade secret to the economic benefit of itself, and knowing that such conversion would injure SLI, knowingly received a copy of the Ironclad$^{TM}$ Runbook, knowing the same to have been obtained without authorization.

v)    Defendants Rolim  and Cipher, with intent to convert a trade secret to the economic benefit of Defendants Cipher, PSM and Prosegur, and knowing that such conversion would injure SLI, knowingly replicated without authorization SLI's trade secrets and placed them on the Prosegur Dashboard.

vi)   Defendants Cipher, PSM and Prosegur, with intent to convert a trade secret to the economic benefit of themselves, and knowing that such conversion would injure SLI, knowingly possessed SLI's trade secrets by incorporating them into the Prosegur Dashboard, knowing them to have been obtained without authorization.

vii)  Defendant B&V, with intent to convert a trade secret to the economic benefit of itself, and knowing that such conversion would injure SLI,

knowingly replicated without authorization SLI's trade secrets and incorporated them into its bid for the OTN-AMI-SOW.

viii)   Defendant B&V, with intent to convert a trade secret to the economic benefit of itself, and knowing that such conversion would injure SLI, knowingly attempted to appropriate a copy of the Ironclad™ Runbook by deception and artifice.

ix)   Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about December 11, 2018 in its bid made in response to the OTN-AMI-SOW.

x)   Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about April 3, 2019 its bid made in response to the OTN and NY- AMI Combined Site Engineering Services SOW.

xi)   Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about March 18, 2019 in its bid in response to RFP Tender No. 776388.

xii)   Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about April 30, 2019 in its BAFO in response to RFP Tender No. 776388.

xiii)   Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary

47

bid submission templates, and other trade secrets SLI supplied on or about October 3, 2019 in its bid in response to RFP Tender No. 789546.

xiv)   Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about November 12, 2019 in its bid in response to RFP Tender No. 792241.

xv)    Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about November 13, 2019 in its BAFO in response to RFP Tender No. 792241.

xvi)   Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about February 7, 2020 in its BAFO in response to RFP Tender No. 795776.

xvii)  Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about April 6, 2020 in its bid in response to RFP Tender No. 798582.

xviii) Defendants Iberdrola and Avangrid, with intent to convert a trade secret to the economic benefit of one or more of themselves, Prosegur, Cipher, PSM, UTI and B&V, and knowing that such conversion would injure SLI, knowingly replicated and conveyed without authorization to one or more of Prosegur, Cipher, PSM, UTI and B&V, *inter alia,* the prices, proprietary bid submission templates, and other trade secrets SLI supplied on or about April 8, 2020 in its BAFO in response to RFP Tender No. 798582.

177.   The pattern of racketeering activity of the Core Enterprise Defendants additionally included numerous acts perpetrated during the Relevant Period which are indictable under 18

U.S.C. § 1343 (relating to wire fraud) and which fall within the scope of 18 U.S.C. §§ 1961(1)(B) and (5), in that certain of Core Enterprise Defendants, intending to obtain property by fraudulent pretenses, caused to be transmitted by wire communication in interstate commerce, writings specifically intended to further their fraudulent scheme.

178.    Defendants Iberdrola and Avangrid caused Defendant Networks to use interstate wires to issue RFPs to, *inter alia,* SLI, with no intention of considering the award of the contracts to SLI.  Defendants Iberdrola and Avangrid did not intend the RFPs to serve as a vehicle for assessing SLI's qualifications for the award of any given contract, but rather, as a fraudulent solicitation intended to elicit and misappropriate the trade secrets of SLI as a means of aiding SLI's competitors, of enriching themselves through the CAPEX that those competitors would provide, and of aiding in the furtherance and/or concealment of the Core Enterprise Defendants' scheme to interfere with the legitimate procedures of Networks for the award of contracts.

179.    Individual indictable acts under 18 U.S.C. § 1343 include, *inter alia,* the following:

i)      At 5:43 am on February 18, 2019, Iberdrola and Avangrid caused Networks to  transmit RFP Tender No. 776388 to, *inter alia,* SLI. in order to obtain, by fraudulent pretenses, property in the form of SLI's prices and proprietary bid submission templates, and other trade secrets.

ii)     At 3:06 pm on September 25, 2019, Iberdrola and Avangrid caused Networks to  transmit RFP Tender No. 789546 to, *inter alia*, SLI, in order to obtain, by fraudulent pretenses, property in the form of SLI's prices and proprietary bid submission templates, and other trade secrets.

iii)    At 3:03 am on November 13, 2019, Iberdrola and Avangrid caused Networks to  transmit Tender No. 792241 to, *inter alia*, SLI, in order to obtain, by fraudulent pretenses, property in the form of SLI's prices and proprietary bid submission templates, and other trade secrets.

iv)     At 4:56 am on Monday, February 3, 2020, Iberdrola and Avangrid caused Networks to  transmit RFP Tender No. 795776 to, *inter alia*, SLI, in order to obtain, by fraudulent pretenses, property in the form of SLI's prices and proprietary bid submission templates, and other trade secrets.

49

v)      At 6:54 am on April 5, 2020, Iberdrola and Avangrid caused Networks to transmit RFP Tender No. 798582 to, *inter alia*, SLI, in order to obtain, by fraudulent pretenses, property in the form of SLI's prices and proprietary bid submission templates, and other trade secrets.

180.    The conduct of the Bid-Rigging Scheme was continuous, and took place between 2018 and 2020. It involved multiple acts of theft, extortion and fraud, was directed at numerous procurement contracts, and caused numerous separate and distinct injuries.

181.    By means of the foregoing violations of RICO, Plaintiff was injured in its business and property in an amount in excess of $36.6 million.

### Fourth Cause of Action

### CIVIL RICO CONSPIRACY

### *(As against all Defendants)*

182.    SLI repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 181above.

183.    Defendants conspired to commit the violations of 18 U.S.C. § 1962(c) alleged in paragraphs 161 through 181 above.

184.    At all relevant times, Defendants agreed and conspired to participate, directly and indirectly, in the conduct of the Bid-Rigging Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

185.    Defendants committed and/or caused to be committed a series of overt acts in furtherance of the conspiracy alleged herein and to effect the objectives of the Bid- Rigging Scheme, each member Defendant knowing the general nature of the conspiracy and that the conspiracy extended beyond that Defendant's role.

186.    By means of the foregoing violations of RICO, SLI was injured in its business and property in an amount in excess of $36.6 million.

**Fifth Cause of Action**

**ROBINSON-PATMAN ACT**

*(As against the Vendor Defendants)*

187.    SLI repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 186 above.

188.    SLI is a "person" within the meaning of 15 U.S.C. § 7.

189.    Each Vendor Defendant is a "person" within the meaning of 15 U.S.C. § 7.

190.    Each Utilities Defendant is a "person" within the meaning of 15 U.S.C. § 7.

191.    SLI and the Vendor Defendants are competitors in the United States market for the supply of equipment and related services relative to the securing of power grid networks for electric utilities.

192.    The equipment sought to be supplied by SLI and the Vendor Defendants to electric utilities, including the Utilities Defendants, constitute "goods, wares or merchandise" within the meaning of 15 U.S.C. § 13(c).

193.    The Utilities Defendants were engaged in commerce during the Relevant Period.

194.    The Vendor Defendants were engaged in commerce during the Relevant Period.

195.    SLI was engaged in commerce during the Relevant Period.

196.    In the course of such commerce, the Vendor Defendants and/or an agent, representative or other intermediary acting for or in their behalf, paid or granted a commission, brokerage or other compensation of significant value to the Utilities Defendants, and/or an agent representative or other intermediary acting for or on their behalf.

197.    This commission, brokerage or other compensation consisted of the CAPEX Premiums, which were granted directly to the Utilities Defendants and retained by the Utilities

Defendants for their own benefit.  The commission, brokerage or other compensation was not paid or received in exchange for services rendered in connection with the purchase or sale of goods.

198.    Granting the CAPEX Premiums to the Utilities Defendants constituted a per se violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

199.    Through their Robinson-Patman Act violations, the Vendor Defendants injured, destroyed or prevented competition in the market for the supply of power grid network security, and data center equipment and related services to the Utilities Defendants.

200.    As a result of these violations, the Vendor Defendants caused the Utilities Defendants to award to the Vendor Defendants lucrative contracts to which SLI would otherwise have been entitled.  Because of the Vendors' anti-competitive conduct, SLI was injured by being deprived the award of millions of dollars of contracts.

201.    SLI's injuries constituted antitrust injury resulting from the direct and reasonably foreseeable effect of the anti-competitive and unlawful conduct of the Vendor Defendants.

202.    As a result of their conduct, the Vendor Defendants are liable for SLI's losses in an amount of not less than $36.6 million, to be determined at trial.

203.    Pursuant to Section 4 of the Clayton Act, 15 USC § 1, SLI is entitled to recover three-fold its damages, plus costs and attorneys' fees from the Vendor Defendants.

### Sixth Cause of Action

### BREACH OF CONTRACT

### *(As against Cipher, PSM and Prosegur)*

204.    SLI repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 204 above.

205.    The MOU, as entered into between SLI and Cipher, is a valid and binding contract.

206.    The NDA, as entered into between SLI and Cipher, and as incorporated by reference in the MOU, is a valid and binding contract.

207.    The NDA, and by extension, the MOU, required that Cipher, its parent company, and its affiliates retain Confidential Information in confidence.

208.    SLI's proprietary bidding information constituted Confidential Information within the meaning of the NDA.

209.    Cipher, PSM and Prosegur breached the NDA and the MOU by failing to safeguard, and otherwise retain in confidence, SLI's proprietary bidding information.

210.    SLI performed its obligations under the NDA and the MOU.

211.    Under the terms of the NDA, a party found by a court of competent jurisdiction to have breached the NDA in any material respect is required to reimburse the non-breaching party for all costs, expenses and attorneys' fees incurred by the non-breaching party to enforce the terms of the NDA and collect damages.

212.    By reason of the breaches of Cipher, PSM and Prosegur, SLI was injured, and is entitled to damages in an amount of not less than $14 million, to be determined at trial, along with costs, expenses and attorneys' fees.

## Seventh Cause of Action

### BREAK OF CONTRACT

### *(As against Cipher, PSM and Prosegur)*

213.    SLI repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 213 above.

214.    The MOU, as entered into between SLI and Cipher, is a valid and binding contract.

215.    The NDA, as entered into between SLI and Cipher, and as incorporated by

reference in the MOU, is a valid and binding contract.

216.    SLI's proprietary bidding information constituted Confidential Information within the meaning of the NDA.

217.    The NDA, and by extension, the MOU, required that Cipher, its parent company, and its affiliates use Confidential Information for no purpose other than for considering and carrying out a professional business relationship with Security Limits Inc.

218.    Cipher, PSM and Prosegur breached the NDA and the MOU by conspiring with the Utilities Defendants to orchestrate the removal of procurements valued at $84 million from the Original ICT Engineering RFP, and the inclusion of those procurements in an RFP on which SLI was not invited to bid.

219.    SLI performed its obligations under the NDA and the MOU.

220.    Under the terms of the NDA, a party found by a court of competent jurisdiction to have breached the NDA in any material respect is required to reimburse the non-breaching party for all costs, expenses and attorneys' fees incurred by the non-breaching party to enforce the terms of the NDA and collect damages.

221.    By reason of the breaches of Cipher, PSM and Prosegur, SLI was injured, and is entitled to damages in an amount of not less than $5.1 million, to be determined at trial, along with costs, expenses and attorneys' fees.

### Eighth Cause of Action

### BREACH OF CONTRACT

### *(As against UTI)*

222.    SLI repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 222 above.

54

223.    The UTI Subcontractor Agreement, as entered into between SLI and UTI, is a valid and binding contract.

224.    The terms of the UTI Subcontractor Agreement explicitly delegate to SLI, in its capacity as Chief Security Architect, responsibility for, *inter alia*, purchasing with respect to the Corporate Security Program, using a mix of third-party vendors, consultants, and contractors.

225.    UTI breached the UTI Subcontractor Agreement by arrogating to itself Corporate Security Program procurements that SLI was contractually entitled to make.

226.    SLI performed its obligations under the UTI Subcontractor Agreement.

227.    The terms of the UTI Subcontractor Agreement provide that the prevailing party in any action brought to enforce its terms and provisions is entitled to recover the reasonable costs and expenses of such litigation, including reasonable attorneys' fees and expenses.

228.    By reason of UTI's breach, SLI was injured, and is entitled to damages in an amount of not less than $3.9 million to be determined at trial, along with reasonable attorneys' fees and expenses.

## Ninth Cause of Action

## BREACH OF CONTRACT

### *(As against UTI)*

229.    SLI repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 229 above.

230.    The UTI Subcontractor Agreement, as entered into between SLI and UTI, is a valid and binding contract.

231.    The terms of the UTI Subcontractor Agreement provided that approved expenses would be treated as a direct pass-through to Avangrid based on local GSA rates, and would be

reimbursed to SLI by UTI on the basis of reimbursement requests supported by receipts for the relevant expenses.

232.    SLI presented UTI with reimbursement requests, with supporting receipts, for expenses incurred by SLI in connection with the ICTPRIVATECLOUD project, in the sum of $114,750.22, as set forth in Exhibit B (the "Unreimbursed Expenses").  UTI breached the UTI Subcontractor Agreement by failing to reimburse SLI for the Unreimbursed Expenses.

233.    SLI performed its obligations under the UTI Subcontractor Agreement.

234.    The terms of the UTI Subcontractor Agreement provide that the prevailing party in any action brought to enforce its terms and provisions is entitled to recover the reasonable costs and expenses of such litigation, including reasonable attorneys' fees and expenses.

235.    By reason of UTI's breach, SLI was injured, and is entitled to damages in the amount of $114,750.22 plus pre-judgment interest, along with reasonable attorneys' fees and expenses.

**Tenth Cause of Action**

**BREACH OF CONTRACT**

***(As against Avangrid)***

236.    SLI repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 236 above.

237.    The EULA, as entered into between SLI and Avangrid, is a valid and binding contract.

238.    Under the terms of the EULA, SLI granted Avangrid a license to employ SLI's Ironclad<sup>TM</sup> technology.

239.    Subject to inapplicable exceptions, the terms of the EULA prohibited Avangrid from copying and/or disseminating, in whole or in part, the intellectual property constituted by SLI's Ironclad<sup>TM</sup> technology, or materials incorporating or reflecting SLI's Ironclad<sup>TM</sup> technology, to unlicensed parties absent prior written consent from SLI.

240.    The Ironclad<sup>TM</sup> Runbook is a comprehensive, proprietary compendium of, *inter alia*, blueprints, technical specifications, and equipment necessary to build and implement an Ironclad<sup>TM</sup> design.

241.    The Ironclad<sup>TM</sup> Runbook incorporates and reflects SLI's Ironclad<sup>TM</sup> technology.

242.    David Lathrop, at the behest of Avangrid, and in his capacity as Avangrid's agent, breached the EULA by providing a copy of the Ironclad<sup>TM</sup> Runbook to UTI, an unlicensed party, without the prior written consent of SLI.

243.    By reason of Avangrid's breaches, SLI was injured, and is entitled to damages in an amount of not less than $1 million, to be determined at trial.

## Eleventh Cause of Action

### MISAPPROPRIATION OF TRADE SECRETS

### *(As against UTI)*

244.    SLI repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 244 above.

245.    As a result of its extensive, prior experience in the design and maintenance of systems for securing power grid networks, SLI possesses a compilation of information regarding the provision of such services for specific, individual utilities, and the design of technical and pricing proposals for the provision of such services. Its Ironclad<sup>TM</sup> technology, and the Ironclad<sup>TM</sup>

57

Runbook that is indispensable to its implementation, are compilations of information that are unique and proprietary to SLI, and not known generally.

246.    SLI's possession of this information gives it the opportunity to obtain an advantage over competitors who do not have it.  SLI's Ironclad[TM] technology is of great value, was developed by SLI at significant expense, and could not have been easily duplicated or acquired by others through proper means.

247.    SLI's Ironclad[TM] technology constitutes a trade secret.  The Ironclad[TM] Runbook that SLI created to permit the implementation of the Ironclad[TM] technology contains those trade secrets.

248.    SLI took appropriate steps to protect those trade secrets and maintain their confidentiality.

249.    UTI misappropriated SLI's trade secrets by accepting from David Lathrop, without entitlement, SLI's Ironclad[TM] Runbook, and by improperly employing it to compete with SLI.  It did so by, among other things, using the information in the Ironclad[TM] Runbook to create and price bids it would otherwise been unable to produce without the benefit of SLI's trade secrets.

250.    By reason of UTI's misappropriation of SLI's trade secrets, SLI was injured, and is entitled to damages in an amount of not less than $1 million, to be determined at trial.

**Twelfth Cause of Action**

**MISAPPROPRIATION OF TRADE SECRETS**

***(As against Cipher, PSM and Prosegur)***

251.    SLI repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 250 above.

58

252.    As a result of its extensive, prior experience in the design and maintenance of systems for securing power grid networks, SLI possesses a compilation of information regarding the provision of such services for specific, individual utilities, and the design of technical and pricing proposals for the provision of such services.  That compilation of information is unique and proprietary to SLI, is not known generally.

253.    SLI's possession of this information gives it the opportunity to obtain an advantage over competitors who do not have it.  SLI's design, provisioning and pricing expertise  is of great value, was developed by SLI at significant expense, and could not have been easily duplicated or acquired by others through proper means.

254.    SLI's design, provisioning and pricing expertise, and the SLI bidding information that incorporate and reflect that expertise, all constitute trade secrets.

255.    SLI took appropriate steps to protect those trade secrets and maintain their confidentiality.

256.    Cipher, PSM and Prosegur misappropriated SLI's trade secrets by improperly using SLI's bidding information for purposes other than for considering and carrying out a professional business relationship with Security Limits Inc.  They did so by employing SLI's bidding information to help the Utilities Defendants refine and issue a superseding RFP styled Tender No. 789646, which was designed to permit Prosegur entities to bid, and to exclude SLI from bidding, on $134 million of procurements removed from the Original ICT Engineering RFP.

257.    By reason of the misappropriation of SLI's trade secrets by Cipher, PSM and Prosegur, SLI was injured, and is entitled to damages in an amount of not less than $5.1 million, to be determined at trial.

11018316.3

**Thirteenth Cause of Action**

**MISAPPROPRIATION OF TRADE SECRETS**

*(As against the Utilities Defendants)*

258.    SLI repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 257 above.

259.    As a result of its extensive, prior experience in the design and maintenance of systems for securing power grid networks, SLI possess a compilation of information regarding the provision of such services for specific, individual utilities, and the design of technical and pricing proposals for the provision of such services.   That compilation of information is unique and proprietary to SLI, is not known generally.

260.    SLI's possession of this information gives it the opportunity to obtain an advantage over competitors who do not have it.   SLI's design, provisioning and pricing expertise  is of great value, was developed by SLI at significant expense, and could not have been easily duplicated or acquired by others through proper means.

261.    SLI's design, provisioning and pricing expertise, and the SLI bidding information that incorporate and reflect that expertise, all constitute trade secrets.

262.    SLI took appropriate steps to protect those trade secrets and maintain their confidentiality.

263.    The Utilities Defendants misappropriated SLI's trade secrets by improperly using SLI's bidding information for purposes other than for considering SLI's entitlement to be awarded the contract sought to be obtained through the bid that contained it.   They did so by employing SLI's bidding information to refine and issue a superseding RFP styled Tender No. 789646, which

was designed to permit Prosegur entities to bid, and to exclude SLI from bidding, on $134 million of procurements removed from the Original ICT Engineering RFP.

264.     By reason of the Utilities Defendants' misappropriation of SLI's trade secrets, SLI was injured, and is entitled to damages in an amount of not less than $5.1 million, to be determined at trial.

### Fourteenth Cause of Action

### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

***(As against the Vendor Defendants, David Lathrop, John Allen, Tom Fitzgerald, Enrique Victoreo, Antonio Asenja, Ed Boucas, Andre Viera Rolim and Bill Reilly)***

265.     SLI repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 264 above.

266.     SLI enjoyed a business relationship with the Utilities Defendants in light of its successful design and implementation of the Avangrid Secure Grid, and its licensing to Avangrid of SLI's Ironclad™ technology.  SLI reasonably expected that business relationship to continue in light of its intimate familiarity with its Ironclad™ technology, and its understanding of the services and equipment required to maintain and expand the Avangrid Secure Grid.

267.     The Vendor Defendants, and Defendants David Lathrop, John Allen, Tom Fitzgerald, Enrique Victoreo, Antonio Asenja, Ed Boucas, Andre Viera Rolim and Bill Reilly (the "Interfering Defendants") interfered with that business relationship by reason of their participation in, and furtherance of, the Bid-Rigging Scheme.

268.     Specifically, the Interfering Defendants' participation in the Bid-Rigging Scheme enabled the Utilities Defendants and the Vendor Defendants to misuse SLI's confidential bidding

information in order to benefit the Vendor Defendants with, *inter alia*, the award of lucrative contracts and associated procurements to which they were not entitled.

269.    The Interfering Defendants acted knowingly, dishonestly, unfairly and improperly, depriving SLI of lucrative contracts and associated procurements that would have otherwise been awarded to SLI absent the misuse of its confidential bidding information.

270.    By reason of the Interfering Defendants' knowing, dishonest, unfair and improper acts, SLI was injured, and is entitled to damages in an amount of not less than $36.6 million, to be determined at trial.

### Fifteenth Cause of Action

### UNJUST ENRICHMENT

#### (As against the Vendor Defendants)

271.    SLI repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 270 above.

272.    The preparation by SLI of bidding materials created in response to the Utilities Defendants' Requests for Proposals required the commitment by SLI of substantial time, effort and expertise.  The bids constitute the valuable property of SLI.

273.    The Vendor Defendants made improper use of SLI's bidding materials by using the information they contained to formulate their own bidding materials.

274.    Through those improper means, the Vendor Defendants were able to secure from the Utilities Defendants the award of valuable contracts they would not otherwise have obtained, and to which SLI would have otherwise been entitled.

275.    Through their improper use of SLI's bidding materials, the Vendor Defendants were unjustly enriched at SLI's expense.

276.   Under those circumstances, equity and good conscience require that the Vendor Defendants make restitution for their unjust enrichment.

277.   SLI is entitled to damages for the amount, to be determined at trial, by which the Vendor Defendants were unjustly enriched by their improper use of SLI's bidding materials.

**WHEREFORE**, SLI seeks judgment against Defendants as follows:

(i)   On SLI's first cause of action, awarding SLI treble damages in an amount of not less than $110 million, to be determined at trial, along with attorneys' fees;

(ii)   On SLI's second cause of action, awarding SLI treble damages in an amount of not less than $110 million, to be determined at trial, along with attorneys' fees;

(iii)   On SLI's third cause of action, awarding SLI treble damages in an amount of not less than $110 million, to be determined at trial, along with attorneys' fees;

(iv)   On SLI's fourth cause of action, awarding SLI treble damages in an amount of not less than $110 million, to be determined at trial, along with attorneys' fees;

(v)   On SLI's fifth cause of action, awarding SLI treble damages in an amount of not less than $110 million, to be determined at trial, along with attorneys' fees;

(vi)   On SLI's sixth cause of action, in an amount of not less than $14 million, along with costs, expenses and attorneys' fees;

63

(vii)    On SLI's seventh cause of action damages in an amount of not less than $5.1 million, to be determined at trial, along with costs, expenses and attorneys' fees;

(viii)   On SLI's eighth cause of action, damages in an amount of not less than $3.9 million, to be determined at trial, along with costs, expenses and attorneys' fees;

(ix)     On SLI's ninth cause of action, damages in the amount of ~~not less than~~ $114,750.22 plus pre-judgment interest, costs, along with expenses and attorneys' fees;

(x)      On SLI's tenth cause of action, damages in an amount of not less than $1 million, to be determined at trial;

(xi)     On SLI's eleventh cause of action, damages in an amount of not less than $1 million, to be determined at trial;

(xii)    On SLI's twelfth cause of action, damages in an amount of not less than $5.1 million, to be determined at trial;

(xiii)   On SLI's thirteenth cause of action, damages in an amount of not less than $5.1 million, to be determined at trial;

(xiv)    On SLI's fourteenth cause of action, damages in an amount of not less than $36.6 million, to be determined at trial;

(xv)     On SLI's fifteenth cause of action, damages in an amount to be determined at trial by which the Vendor Defendants have been unjustly enriched, and the imposition of a constructive trust on such profits that are traceable to such unjust enrichment; and

64

(xvi)   Awarding SLI such other and further relief as the Court deems just and

proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated:  New York, New York
        November 29, 2021

Respectfully submitted,

CARTER LEDYARD & MILBURN LLP

By: ___/s/ John M. Griem, Jr._____
John M. Griem, Jr.
Griem@clm.com
Jeffrey S. Boxer
Boxer@clm.com
2 Wall Street
New York, New York 10005
Tel: (212) 238-8659

*-and-*

THE LAW OFFICES OF PETER ADELMAN, LLC
Peter Adelman
padelman@theadelmanfirm.com
95 6th Avenue
Brooklyn, New York 11217
Tel: (718) 783-3500

*Attorneys for Plaintiff Security Limits Inc.*

11018316.3

EXHIBIT A



**Menu**

## Page (Table of Contents)

**TABLE OF CONTENTS**

SECTION I: EXECUTIVE SUMMARY & COMPANY OVERVIEW ............................................... 2
COMPANY INFORMATION ................................................................................................. 3
   Regional Presence ........................................................................................................ 4
SECTION II: PROJECT OBJECTIVES ..................................................................................... 5
SECTION III: PROJECT TEAM ............................................................................................... 6
   Project Team Overview ................................................................................................. 6
   Program Manager and Collaboration ........................................................................... 7
SECTION IV: PROGRAM GOVERNANCE ............................................................................... 7
   Project Manager and Collaboration .............................................................................. 8
   Management and QA/QC .............................................................................................. 9
   Change Management .................................................................................................... 10
   Change in Scope of Services ......................................................................................... 10
   Curriculum Vitae of Proposed Resources ..................................................................... 10
   On-Going Communications and Reporting (Service Delivery Level) ............................. 10
   Initial Project Risks & Assumptions ............................................................................... 11
   Acceptance Criteria ...................................................................................................... 13
   Customer Roles & Responsibilities ............................................................................... 13
   Travel Expenses ............................................................................................................ 13
SECTION V: ICT PRICING SHEET SUMMARY – LABOR ......................................................... 14
SECTION VI: ICT PRICING SHEET SUMMARY – MATERIALS ................................................ 14
   Phase I - Summary ........................................................................................................ 14
   Phase II Summary ......................................................................................................... 15

---

## Page 2



### SECTION I: EXECUTIVE SUMMARY & COMPANY OVERVIEW

| KEY COMPONENTS OF SECTION | QUALIFICATION INFORMATION |
|---|---|
| • Overview of Project Experience<br>• Company Information<br>• Security Limits Inc. Design & Engineering, Cyber Security, Regulatory Compliance & Risk Management Services, General IT Consulting | • Official registered name (Corporate, D.B.A., Partnership, etc.), Dun & Bradstreet Number, Primary and secondary SIC numbers, address, main telephone number, toll-free numbers, and facsimile numbers.<br>• Key Contact name, title, address (if different from above), direct telephone and fax number.<br>• Person authorized to contractually bind the organization for any proposal.<br>• Brief history, including year established and number of years Security Limits Inc. has been offering Systems Design and Engineering, Information Security, Risk Management, Including Assessments and Compliance Consulting Services, Business Continuity and Disaster Recovery Testing with specific emphasis on electric utility industry security issues. |

Security Limits Inc. is pleased to provide Avangrid with a response to tender# 0000776388 for assisting AVANGRID with continued maintenance and maturity of its Physical and Cyber Security Program (ASD-ICT). There is tremendous value in ensuring a centralized engineering approach to management of architectural service delivery across Avangrid and the ASD-ICT. Security Limits Inc. is currently supporting the Avangrid Physical and Cyber Security Program in accordance with framework one (FA1) design and engineering requirements established through Security Limits Inc.'s design USPTO SEC20.001+U.S. No. 62/818,390 entitled "Integrated Secure Platform. We would welcome the opportunity to continue this partnership through Framework-two (FA2); thus, ensuring continued maturity and cyber growth of the platform in accordance with design specifications.

In addition, Security Limits Inc. takes advantage of this opportunity to provide insight regarding its experience and various lines of businesses. Security Limits is a small boutique IT engineering, architecture, and cyber security company that thrives on the development of intellectual property and also offers regulatory compliance program maintenance and risk management services.

This proposal documents Security Limits' understanding of the client requirements, partnership objectives, scope, and assumptions with respect to tender# 0000776388. It also describes our approach with respect to various services, including but not limited to design and engineering, cyber security compliance, Vulnerability Management, risk assessments, penetration testing, e-discovery, and IT consulting services.

Over the past 11 years, Security Limits Inc. has designed and built cyber security programs and infrastructure for more than 25 customers –including Major Power Utilities and Banks in the United States, Fortune 500 companies, and medium size businesses regulated by Federal Agencies – effectively addressing their information systems security and compliance challenges.

2     954 Lexington Ave, #1017
Manhattan, New York, 10021
Phone: (917) 270-8209
Email: psilva@securitylimits.com

---

## Page 3



SLI serves as a strategic advisor to major utilities and banks, helping them to develop comprehensive security management system programs and to design and develop virtualized private cloud systems infrastructure, networking, and ICS migration strategies (ISCADA and DSCADA) that enable achievement of business objectives while improving our national security. We assist in providing security compliance services to customers, partners, regulators, employees and shareholders. Our team offers a unique blend of services and products that help address policy, compliance, cyber security, and systems architecture both physical and logical; thus, minimizing vulnerabilities and risks.

### COMPANY INFORMATION

**Security Limits Inc. consultants Pc:**
*Registered name in State of New York*

| Structure & Established | DUNS Number | SIC Numbers | Address | Main Telephone & Fax | Key Contact Person & Title | Contract Contact |
|---|---|---|---|---|---|---|
| WBE Women Owned corporation, established 2007 | 081348756 | 8712 8748 | 954 Lexington Ave. #1017 New York, New York | 570-397-0027 | Paul Silva, Cyber Vice President | Maine Conaghan President |

Founded originally in 2007, Security Limits LLC and changed to Women Business Enterprise in 2018 under Security Limits Inc. is a full-service technology engineering, architecture, and consulting solutions firm. Security Limits Inc. is among the leaders in many service categories, including Hyper Converged Data Center Design and Engineering Services; including but not limited to TSCADA, DSCADA, and Smart Grid - AMI cyber security design and engineering. Security Limits, Inc. currently Intellectual Property in cyber security modeling, plans, and design. We are also currently assisting Avangrid® in the design, engineering, integration and deployment of the Avangrid Security Domain or ASD-ICT, a senior Security Limits Inc. resource serves as the "Chief Architect".

— Our pledge is to deliver:
" *Cyber Security within your limits and to make our clients successful".*

Security Limits Inc. specializes in Data Center Virtualization, IT Systems Design, Engineering, and Integrations, particularly in respect to SCADA and Smart Grid, Migration, Upgrades, and Deployments.
"We have tremendous know-how in talent acquisition."

3     954 Lexington Ave, #1017
Manhattan, New York, 10021
Phone: (917) 270-8209
Email: psilva@securitylimits.com

---

## Page 4



### Regional Presence



**(WBE) WOMEN OWNED**

**3+** OFFICES

**44** PROFESSIONALS



Service Area

Security Limits' dedication starts right here in the Northeast, where team members put their full-service engineering, architecture, and security/safety expertise to work. Beyond industry leading qualifications are the firm's employees who will deliver team chemistry, implicit trust, and a love for the local economy - *because it's the community where we live. In addition to our regional headquarters in New York City, we are looking to expand in the Greater Connecticut area to support several clients and projects in the region. Such clients include Dorman Products (NYSE: DORM), Eversource Energy (NYSE: ES), and Citigroup (NYSE: C).*



**Our Northeast Regional Office in Pennsylvania – Located Less than four hours away from Avangrid®
Rochester Electric & Gas Headquarters**

4     954 Lexington Ave, #1017
Manhattan, New York, 10021
Phone: (917) 270-8209
Email: psilva@securitylimits.com



## SECTION II: PROJECT OBJECTIVES

| Project Objectives and SLI's High Level Understanding of Deliverables | VENDOR UNDERSTANDING OF OBJECTIVES: |
|---|---|

Reviewed document reference: Exhibit B1, SOW.docx

The Physical Security Programs main objective is to comply with all regulatory obligations, including the NERC CIP (North American Electric Reliability Corporation – Critical Infrastructure Protection) Standards, to which Avangrid must adhere at the federal and state levels. These standards have undergone several revisions which have resulted in increasing physical security requirements. The objective is to also meet security system best practices within NIST 800 standards. Specifically, the list of NERC standards in force that the Physical Security Program will fulfil is shown in the tables included in Exhibit B1, SOW.docx.

Phase 2 High Level Engineering Objectives 1:

The engineering firm will be responsible for working closely with the Avangrid Security Domain organizations to identify business requirements and quickly establishing the Governance Body and/or CDM Framework, inclusive of CADE. The following services shall be provided as business as usual:
> Site drawings, construction engineering support, and systems' documentation maturity
> Support of design packages necessary for physical and logical site migrations
> Business requirements gathering across every system, product, service in scope
> Development of engineering packages to facilitate procurement activities
> Systems and interfaces integration Engineering across all approved projects and systems in scope i.e. AIM, OT and Security
> Implement a Quality Management System Program
> ICT Systems engineering integration automation and support in DEV, QA, DC1, DC2, and DC3 (DR) environments, control centers, data centers and layout projects

Design, Development and implementation of annual NERC CIP compliance program to ensure regulatory compliance of personnel, systems, and operational processes within the ASD-ICT

The spreadsheet Exhibit C, ICT Engineering Price Sheet has been provided as best effort. Some anomalies in respect to GYT compared to SKU numbers shall be further discussed. We look forward to hearing back from Avangrid.

Regards,

Paulo Silva



## SECTION III: PROJECT TEAM

| KEY COMPONENTS OF SECTION | Project Management Approach |
|---|---|
| • Project Team Overview<br>• Project Manager<br>• Kick-off Meetings<br>• QA/QC<br>• Change in Scope/Mgmt<br>• Assumptions & Risks | Include biographies, resumes and relevant experience of key staff and management personnel.<br><br>Describe bonding process and coverage levels of employees. Security background check will be conducted on all project team members to affirm that no employees working on the engagement have ever been convicted of a felony. |

### Project Team Overview

Security Limits® has assembled a core team of professionals with large-scale systems' hyper convergence, cloud computing, and cyber security experience. This team will consist of a variety of individuals who have proven experience in the planning, development, and implementation of projects with similar scope and scale.

### Experienced and Accomplished Technical Staff

Security Limits is comprised of a distinguished technical staff and partnerships such as Perspecta Labs®, a.k.a. former Bell Labs; Computer Science Departments at Manchester Community College, Stevens Institute of Technology and New York University. We do our best to ensure resources allocated to this program will meet the following criteria as a minimum requirement, depending on position(s): 10% hold PhD's; 15% hold other advanced degrees.

Security Limits and its partners have patent pending filings in process and patents awarded for inventors being named as sole or co-inventors on over 460 patents across the software, security, data analytics, network management, operations, optical and wireless fields. Our intellectual property and know-how will be heavily utilized in this service delivery to ensure a successful engineering endeavor; resumes can be provided upon request.

---



### Program Manager and Collaboration

The primary point-of-contact from Security Limits Inc. will be the Program Manager and/or Service Delivery Manager. The program manager is responsible for overall program leadership, finances, and administration; he/she will be responsible for the day-to-day management of activities at the program level. Additional responsibilities include:
• Lead high-level planning and strategic sessions for program planning, budget, and schedule development
• Review/approve project plans for conformance to program strategy and schedule
• Act as the communications conduit to Avangrid and conducts periodic briefings/status updates
• Escalate decisions to Avangrid as necessary
• Schedule and assign resources to verify that program objectives and schedule are achieved

### SECTION IV: PROGRAM GOVERNANCE

## Program Governance
**Security Limits Inc. Partnering with AVANGRID**

We propose team of senior, experienced Security Limits Inc. personnel integrated with key Avangrid ASD, OT, and AIM stakeholders to drive collaboration, knowledge sharing, and rapid time-to-value for a successful win integration study.





### Project Manager and Collaboration

The primary point-of-contact from Security Limits Inc. at the project level will be the Project Manager (PM)and/or Service Delivery Manager. The PM is responsible for overall Security Limits' Project leadership and administration and will be responsible for interactions with the Avangrid; this may be provided by Avangrid as part of a PMO; however, we will also provide a PM point of contact to ensure effective communication's between companies and vendors. The PM is also accountable for the project schedule, budget, deliverables, and quality of all program elements. Additional responsibilities include:
• Lead low-level planning, logistics, and strategic sessions for project plan schedule development and oversee day-to-day execution;
• Review Project plans for conformance to program strategy and schedule;
• Escalate decisions to Avangrid as necessary;
• Work with the Project team, including sub-contractors and sub-consultants, to identify the technical and process solutions to be employed and deliverables that will be furnished at the completion of the Project;
• Schedule and assign resources to verify that project objectives and schedule are achieved;
• Facilitate overall project execution success;

**Efficiencies**

The following sections highlight some of the benefits of awarding the contract for this RFP to security limits Inc., but not limited to:

✓ Take immediate advantage of Security Limits' knowledge of existing ASD-ICT Architecture and Design: avoid learning curve if using another vendor. Avangrid has adopted and licensed Security Limits Inc.'s IronClad™ design - SEC20.001-U.S. Provisional Patent Application No. 62/818,390; we understand the current infrastructure and future roadmap better than any other external vendor. We hope to continue this very cost-effective partnership in years to come.
✓ Leverage existing "collaboration tools and architecture" supporting ASD; cost savings in program process development/project operationalization.
✓ Leverage existing knowledge of Fiber Optics Network Sites and components; this improves service delivery realization as resources will come-in hitting the ground running as management oversight understands current infrastructure huddles and ways to overcome it more effectively.
✓ Security Limits has experienced resources on staff with proven track record of implementing and auditing AMI cyber and physical security controls; PECO Energy (i.e. Supporting the Pennsylvania Act 129; greater Philadelphia Smart Grid Design, Engineering, and Deployment)
✓ Personnel with PhD in the Fiber Optics field will be assigned to oversee engineering efforts and service realization.
✓ Security: Data Governance mapping to existing Avangrid Compliance requirements along with a historical record of information and actions will be leveraged. This will ensure adequate compliance measures with minimal effort as security limits has already implemented similar controls for the ASD program.

5 — 954 Lexington Ave, #1017 Manhattan, New York, 10021 Phone: (917) 270-8209 Email: psilva@securitylimits.com
6 — 954 Lexington Ave, #1017 Manhattan, New York, 10021 Phone: (917) 270-8209 Email: psilva@securitylimits.com
7 — 954 Lexington Ave, #1017 Manhattan, New York, 10021 Phone: (917) 270-8209 Email: psilva@securitylimits.com
8 — 954 Lexington Ave, #1017 Manhattan, New York, 10021 Phone: (917) 270-8209 Email: psilva@securitylimits.com



Security Limits Inc. utilizes Microsoft SharePoint via the ICTPrivateCloud.com Design to encourage collaboration and sharing across multiple key stakeholders within the Avangrid organizations. SharePoint enhances organizational effectiveness through the following features:

- Remote Access: Project team members, contractors, and staff may be granted web access to information to enable project teams to collaborate on tasks from any location.
- Content Management: The project SharePoint site serves as a repository for all project documents, records, and content. Version control identifies the most current and approved documents. Version history records previous iterations so changes are never lost.
- Security Limits Inc. plans to leverage the ICTPrivateCloud.com domain to ensure all user access remain centralized in a controlled and secure environment; thus, introducing additional cost savings to Avangrid.

**Project Kick-Off Meeting**
We will conduct a project kick-off meeting with Avangrid. The meeting will provide overall coordination, concepts and consistency between Avangrid and Security Limits project teams and sponsors. Initial site tasks will include team review of individual tasks, collection of regulatory/corporate requirements, and identification of accommodation areas in scope for the Avangrid OT Project. We will review current security practices to determine both strategic and tactical initiatives to facilitate the development of the OT Physical and Logical Fiber Network Integration Strategy Roadmap Document. The project plan would be updated accordingly.

Management and QA/QC
The m a n a g e m e n t and Q A/QC phase throughout the entire project lifecycle Security Limits Inc. employs proven project management best practices:

- Security Limits' project management procedures enable the formation of a partnership between all stakeholders. This partnership provides a mutual understanding and agreement of the tasks to be completed and the schedule to be observed. These procedures also require that the correct organizational structure for the project be created, that the proper resources for the project to be identified and committed, and that the proper authority and accountability for the project be established.
- Proactive project planning allows the proposed project schedule to be achieved and verifies that resources are allocated as needed to meet all milestones.
- Effective management control, deliverable product control, and technical reviews are the keys to successful project completion. A Service Delivery Manager and Project Manager will participate in regular management reviews with Avangrid to keep the project properly focused on meeting the proposed functionality and delivering quality results. Quality Control specifications and metrics will be defined in the early stages of the project.



Change Management
The change control procedures followed will be consistent with Project Management Procedures and include the following processes:

- A Change Control SharePoint is established by the Security Limits Inc. Project Manager, to track all changes associated with the project effort.
- All change requests will be assessed by the Security Limits Inc. Program Manage
- Project Manager to determine possible alternatives and costs.
- Change Requests will be reviewed and approved by the Avangrid Sponsor.
- The effects of approved change requests on the scope and schedule of the project will be reflected in updates to the project plan as part of weekly dashboard meetings.
- The Change Control database will be updated to reflect status of change requests.

Change in Scope of Services
If unforeseen factors change this scope of work and/or impact the term and cost of the provided services enclosed, Avangrid and Security Limits Inc. may mutually revise the SOW and Security Limits Inc. shall provide customer with an estimate of the impact of such revisions on the fees, payment terms, completion schedule and other applicable provisions of the SOW. If the parties mutually agree to such changes, a written description of the agreed change ("Change Authorization" shall be prepared, incorporating such changes to the FINAL SOW and shall be signed by both parties. The terms of a Change Authorization Form prevail over those of the SOW.

Curriculum Vitae of Proposed Resources
Security Limits Inc. has identified which team members will be assigned to this engagement. We also can supply additional resources upon demand. Based on the nature of the work requested, we will assign consultants from our various departments, including but not limited to program management office (PMO), infrastructure Services, design and engineering to perform the work.

On-Going Communications and Reporting (Service Delivery Level)
To ensure your project is completed in a timely manner with minimum impact to both system resources and personnel, Security Limits Inc. utilizes various communication methods during each phase. Utilized to ensure consistent ongoing communication with our clients throughout the engagement:

- Security Limits Inc. delivers a weekly status report to our primary client contact detailing activities, what is planned for the following day or week, as well as any issues which have arisen that may delay the on-time completion of the engagement.
- Weekly meetings required to review progress and risk and/or issues potentially impacting scope, schedule, and/or cost; each situation shall be reviewed and approved by Avangrid representative; records shall be maintained.



Initial Project Risks & Assumptions

| Risk | Risk Level L/M/H | Likelihood of Event | Mitigation Strategy |
|---|---|---|---|
| **Project Size** | | | |
| Estimated Project Schedule – Tentative | H: 2-3 months | Unlikely | Created comprehensive project timeline with frequent baseline reviews |
| Team Size at Peak | H: 26 members | Certainty | Comprehensive communications plan, frequent meetings, tight project management oversight |
| **Project Definition** | | | |
| Cost Estimates Unrealistic | L: Thoroughly predicted by industry experts using proven practices to 15% margin of error | Unlikely | Will need to be refined in "planning phase" post contract award; it could result in cost reduction or increase; although unlikely. Subject to amendment as new details regarding project scope are revealed |
| Available documentation clouds establishment of program baseline | M: More than 75% complete/current | Unlikely | Balance of information to be gathered by consultant |
| Project Scope Creep | L: Scope generally defined, subject to revision | Unlikely | Scope initially defined in project plan, reviewed monthly by key stakeholders to prevent undetected scope creep |



| Risk | Risk Level L/M/H | Likelihood of Event | Mitigation Strategy |
|---|---|---|---|
| Timeline Estimates Unrealistic | M: Timeline assumes no derailment | Unlikely | Timeline to be reviewed and firmed-up in "planning phase"; Monte Carlo simulation introduces higher levels of assurance |
| Documentation Control and Quality -Maturity Level-1 (e.g. Some inaccuracies in network diagrams and procedural documentation) | M: Documentation Quality | Somewhat likely | Will need to be refined in "planning phase" post contract award; it could result in cost reduction or increase; although unlikely. Subject to amendment as new details regarding project scope are revealed |
| **Project Staffing** | | | |
| Dispersed site locations | M: Site is dispersed | Likely | Additional Travel |
| Weak Business/Customer Participation on Project Team | L: Users are part-time team members | Unlikely | User Group Participants coordinated by full time employee |
| **Project Management** | | | |
| Project Manager | L:Dedicated | Unlikely | Ensure proper projects' coordination, execution and oversight from the program manager; provided by Avangrid PMO |
| Change Management Procedures undefined | L: Well-defined | Unlikely | N/A |



## Acceptance Criteria

On completion of the Services covered by this RFP response, Vendor will submit the Deliverables to Customer for review and final approval in accordance with contractual requirement. Payment shall be conditioned upon acceptance of the Deliverables as described in Article 7 ("Invoicing and Payment") of the Agreement. This contract will be deemed completed when all of the deliverables have been accepted or deemed to have been accepted in accordance with the Agreement.

## Customer Roles & Responsibilities

Avangrid shall facilitate project delivery by Vendor:

(i)   Contribute and/or sign off to defining final deliverables/requirements;

(ii)  Provide access to Avangrid fulltime staff and systems to provide necessary information in timely fashion;

(iii) Provide background materials/access/data necessary to enable services;

(iv)  Review and approve draft deliverables in a timely fashion;

(v)   Provide formal approval of "final schedule" for execution;

(vi)  Ensure access to sites, facilities, and systems so that work can be performed;

## Travel Expenses

Travel expenses are not included. All travel expenses shall be reimbursable by Avangrid, such expenses shall be reimbursed only in accordance with the Avangrid's Travel Policy, and subject to the limits set forth in Section ("Expenses") of the Master Services Agreement.

---



## SECTION V: ICT PRICING SHEET SUMMARY - LABOR

| 2019 (Sept-Dec) | 2020 | 2021 | 2022 (Jan-Aug) | TOTAL AMOUNT |
|---|---|---|---|---|
| | | | | $ 53,387,233.33 |
| $ 460,000 | $ 335,000 | $ 335,000 | $ 148,000 | $ 1,303,000.00 |
| | | | | $ 55,520,000.00 |

## SECTION VI: ICT PRICING SHEET SUMMARY - MATERIALS



$10,904,280.08  ⟵  total 5 years

## Phase I - Summary

Our phase-1 approach focuses on maximizing risk reduction per security dollar spent. This phase will commence with a ramp- up process, to last up to three months, and will include the following:

- Local Office Presence in Rochester, NY
- Workforce Mobilization
- Employee Screening Process, NERC-CIP Compliance, and Onboarding activities
- Establishment of Processes and Procedures for PMO
- Employee Screening Process and Onboarding activities
- Program/Project Plan and Schedule Development (Mutually Agreed)
- Dashboard and Program Reporting Structure

---



## Phase II Summary

During this phase, the team will deliver business as usual services to Avangrid; CADES is operational. As the team reaches its peak performance and size, the expectation is that the average amount of time to perform a task will improve; normalizing service delivery after the first year.

The project will run between 2019 through 2022.

| Holiday | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| New Year's Day | | Wednesday, January 1 | Friday, January 1 | Saturday, January 1 |
| Martin Luther King Jr. Day | | Monday, January 20 | Monday, January 18 | Monday, January 17 |
| Presidents' Day | Monday, February 18 | Monday, February 17 | Monday, February 15 | Monday, February 21, 2022 |
| Memorial Day | Monday May 27 | Monday May 25 | Monday May 31 | Monday, May 30, 2022 |
| Independence Day | Thursday July 4 | Friday July 3 | Monday July 5 | Monday, July 4, 2022 |
| Labor Day | Monday September 2 | Monday September 7 | Monday September 6 | Monday September 5 |
| Thanksgiving Day | Thursday November 28 | Thursday November 26 | Thursday November 25 | Thursday November 24 |
| Christmas Day | Wednesday, December 25 | Friday, December 25 | Saturday, December 25 | Sunday, December 25 |

EXHIBIT B



# INVOICE

50 Alberigi Dr.
Jessup, PA 18434
Phone: (212) 634-9202
Fax: (646) 437-5506
invoices@securitylimits.com

| | |
|---|---|
| **Date** | 3/4/2020 |
| **Invoice #** | 2154 |
| **For** | ICTPRIVATECLOUD DOMAIN SERVICES |

**Bill To:**

Unlimited Technology Inc.
20 Senn Drive
Chester Springs, PA, 19425

**% discount** 0%

| Quantity | Description | Unit price | | Amount | | Discount applied |
|---|---|---|---|---|---|---|
| 60 | CSP annual - Enterprise Mobility + Security E3 | $ | 225.00 | $ | 13,500.00 ✔ | Discount applied |
| 50 | CSP annual - Office 365 Enterprise E3 | $ | 101.00 | $ | 5,050.00 ✔ | Discount applied |
| 10 | CSP1Y - Visio Online Plan2 - | $ | 174.84 | $ | 1,748.40 ✔ | Discount applied |
| 69 | eDiscovery for UTI ICTPRIVATE CLOUD PAYMENT RESPONSIBILITY as per UTI Legal Counsel's Request to obtain "documentation and evidence" of service commitment: Data Collection, Chain of Custody, Examination, Data Analysis, Reporting Services. | $ | 347.00 | $ | 23,943.00 ✔ | Discount applied |
| 42 | Data Restoration and Recovery Services: Recovery of deleted mailboxes, Systems Reconfiguration and Security Review of Accounting anomalies | $ | 347.00 | $ | 14,574.00 ✔ | Discount applied |
| 55 | Secure destruction of ICTPRIVATECLOUD Data per GB $789 USD | $ | 789.00 | $ | 43,395.00 ✔ | Discount applied |
| 1 | Service Charge on DELL Invoice 10% | $ | 2,298.00 | $ | 2,298.00 ✔ | Discount applied |
| | | $ | - | | | |
| | | $ | - | | | |
| | | $ | - | | | |
| | | $ | - | | | |
| **Subtotal** | | | | $ | 104,508.40 | |

Make all checks payable to Security Limits Inc.

If you have any questions concerning this invoice, contact Russell Sands at Russell.Sands@SecurityLimits.com.

**Thank you for your business!**

| | | |
|---|---|---|
| **Credit** | $ | - |
| **Late Fee** | | 9.80% |
| **Additional discount** | | 0% |
| **Balance due** | $ | 114,750.22 |